MAX N. TOBIAS, JR., Judge.
11Travis Henderson (“Henderson”) seeks review of his convictions and sentences for (1) armed robbery, a violation of La. R.S. *225 14:64, for which he received a sentence of seventy years at hard labor without the benefit of parole, probation, or suspension of sentence; and (2) contributing to the delinquency of a juvenile, a violation of La. R.S. 14:92 E(l), for which he was sentenced to five years to run concurrently with his seventy-year sentence. Henderson was multiple billed (pursuant to La. R.S. 15:529.1) as to the armed robbery conviction, found guilty, and sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence.[1]
For the reasons that follow, we remand for further proceedings as discussed infra.
I.
The state filed a bill of information on 21 March 2012 charging Henderson with one count of armed robbery with a firearm, one count of illegal possession of stolen things, and one count of contributing to the delinquency of a juvenile. On |g26 March 2012, Henderson entered pleas of not guilty to all counts, and a motions hearing was set for 20 April 2012.
Thereafter, numerous pretrial conferences and motion hearings were held, one of which resulted in the severing of the count for illegal possession of stolen property. Subsequently, Henderson pleaded guilty to that charge.
A jury found Henderson guilty of armed robbery and of contributing to delinquency of a juvenile at the 7-8 January 2013 trial. Henderson was sentenced on 25 January 2013 as noted above. The state multiple billed Henderson as a fourth felony offender as to the armed robbery conviction, and the trial court, finding him to be a multiple offender, subsequently imposed a life sentence without benefits.[2] This timely appeal followed.
II.
At a motion hearing on 8 June 2012, and at the jury trial on 8 January 2013, Detective Travis Ward testified that he was employed at the Eighth District of the New Orleans Police Department (“NOPD”) in the Violent Crimes Unit when he was called to investigate an armed robbery on 2 January 2012. He explained that the victim was walking in the 1000 block of Ursulines Street in New Orleans, while talking on her cell phone, when she was approached by a young male. According to Detective Ward, the young male began to question the victim as to what she was doing, et cetera. The victim motioned for the young man to leave her alone. At that time, a white van pulled up, and the driver got out. The driver told the young male something to the effect of showing him how to do it; the driver took a gun from the young male and robbed the victim of her bag and cell phone. IsThe victim watched as the two suspects got into the white van, sat for a short moment, and then drove away. During trial, the detective identified Henderson in the courtroom as the suspect who had exited the white van and took the victim’s belongings. Detective Ward also testified that he viewed a bad quality video surveillance film of the crime. He stated that he learned from the victim that her cell phone was used after it was stolen. The victim was able to obtain the number that was called from her phone, and she *226 provided him with that information. He also testified that he called the phone number provided by the victim and linked the call to the home of a Ms. Karen Elzey in New Orleans. Detective Ward testified that he and Detective Willie Jenkins went to the home of Ms. Elzey and, with Ms. Elzey’s permission, questioned her daughter, Alicia Elzey, who explained that the phone number called from the victim’s stolen cell phone was her phone number and that she remembered receiving a call from J.W.,[3] a minor who at the time of trial was held in a juvenile detention program, and who she knew attended Marrero Middle School.
Detective Ward testified that he searched the database for J.W. and located him at Marrero Middle School. He and Detective Michael Flores went to the school and retrieved six photographs of students, one being of J.W. He stated that an identification of J.W. was made by the victim after he showed her the six photographs. Thereafter, Detective Ward went to the home of J.W., where J.W. admitted to the events and told the detective that an air pistol, not a real (gunpowder) gun, was used during the crime. J.W. also stated that he was accompanied by Travis Henderson at the time of the crime. After investigating the | ¿matter further, Detective Ward learned that Henderson had been recently arrested in the French Quarter for a simple robbery. He obtained a photograph of Henderson and returned to J.W., who identified Henderson as “the person who was teaching him to rob people.”
At the jury trial on 7 January 2013, Detective Troy Williams testified that he was a sergeant with the NOPD for approximately nineteen years. He stated that in July of 1999, while a detective in the Eight District, he was called to investigate an armed robbery at the intersection of Burgundy Street and Ursulines Avenue. He testified that two females were robbed at gunpoint. A few days later a suspect, fitting the description of the armed robber in this case, was stopped in close proximity to where the crime occurred. Detective Williams explained that after the female victims identified Henderson in a photographic lineup, Henderson was convicted for that 1999 robbery.
Miranda Culp of Perm Valley, California, testified that she lived in New Orleans in 1999 and worked as a cocktail waitress in the French Quarter when she was robbed at gunpoint at the intersection of Burgundy Street and Ursulines Avenue by Henderson.
Sergeant Nicholas Gernon testified that he was assigned to the Eighth District of the NOPD in the Crimes Unit at the time of the subject crime. He stated that he searched for surveillance video of the 1000 block of Ursulines Street and was able to obtain video from a residence located in the 900 block of Ursulines Street and from the WWL television station at the corner of North Rampart Street and Ursulines Avenue. (The WWL video was played for the jury).
J.W. testified that he was sixteen years old, stationed at Camp Beauregard in Pineville, Louisiana, for the Youth Challenge Program, a Louisiana program aimed 15to assist at-risk kids, and working on obtaining his GED. He stated that on 2 January 2012 he was in eighth grade at Marrero Middle School and was friends with Henderson. He identified Henderson sitting in the courtroom. J.W. testified *227 that on 2 January 2012, after he walked to his friend Trey’s house and learned that Trey was not home, he ran into Henderson, who gave him a ride home in a blue Chevrolet Impala automobile. J.W. stated that he later returned to Trey’s house, but Trey was still not home. J.W., seeing Henderson again, accepted a ride with Henderson, who was now driving a white van. He stated that he and Trey enjoyed playing with BB guns and that Henderson knew that J.W. had a BB gun that he purchased from Wal-Mart.
J.W. testified that he and Henderson ate at Henderson’s mother’s house, and thereafter proceeded to the French Quarter in the white van. He stated that he was instructed by Henderson to rob a group of people on Canal Street, but did not do so. He said that Henderson circled the block and instructed him to “get out, get her,” meaning an African-American female who was walking down the street talking on a cell phone with a purse across her body. J.W. approached the victim and asked her some questions that he could not then recall. Henderson then jumped from the van with J.W.’s BB gun and yelled at J.W. for not knowing what to do. J.W. headed back to the van, and Henderson soon approached and asked J.W., who was then sitting in the driver’s seat, if he knew how to drive. Henderson then crossed over J.W. and drove away.
J.W. stated that Henderson took a cell phone, a computer, and some paperwork from the victim. He also testified that when Henderson returned to the van he saw the handgun. J.W. used the stolen cell phone to call his girlfriend, Alicia El-zey, to ask her for gas money. He stated that Henderson attempted to |fipawn and sell the computer. J.W. testified that he saw the video of the armed robbery, and he could see himself and Henderson therein. He corroborated Detective Ward’s testimony that he picked Henderson out of a photographic line-up when the police came to his house.
Margaret Padaya testified that on 2 January 2012 she worked as a special education teacher in the French Quarter at KIPP NOLA Leadership Primary, a school. She testified that she was walking to her home on Ursulines Street while talking to her co-worker on her cell phone. She explained that at first she ignored the young male who approached her until she realized that something was not right about the situation. At that time, she put her hands up and said “back up.” She stated that the young man backed away from her as an older man got out of a white truck, and she observed a gun being exchanged between the two men. She said the older man stated “let me show you how this is done,” whereupon he took a bag out of her hand and drove past her. Ms. Padaya identified herself in the video played at trial.
III.

ERRORS PATENT

The record reveals no errors patent.
IV.
A.

DISCUSSION

Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), is well-settled law that both Henderson and the state rely upon in this appeal. In Davis, juvenile Richard Green was on an errand for his mother when he saw two African-American men on the side of the road close to his house. The men were standing next to a Chevrolet 17vehicle. The first time Green passed the men he had a limited conversation with them, and the second time he passed them on his return home, he saw *228 that one of the men had a crowbar. Later it was learned that a safe was stolen from a barroom in Anchorage, Alaska, and that the empty safe was found near Green’s home. The Alaskan State Troopers went to Green’s home, questioned him, and Green subsequently identified the two men he saw on the side of the road. Once the Chevrolet was found and paint shavings from the safe were identified in the vehicle, the troopers were able to make arrests.
Because Green had a juvenile criminal record, the prosecutors moved for a protective order to prevent the cross-examination of Green. According to the prosecutors, they did not want the jury to question the credibility of Green’s testimony by assuming Green was hasty in identifying the suspects because of his past criminal history of burglary. The trial court granted the order, and the defendant appealed. The Supreme Court first looked at the Sixth Amendment:
The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.” This right is secured for defendants in state as well as federal criminal proceedings under Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Confrontation means more than being allowed to confront the witness physically. ‘Our cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination.’ Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Professor Wigmore stated:
‘The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal | sputting of questions and obtaining immediate answers.’ [citation omitted].
Davis, 415 U.S. at 315-16, 94 S.Ct. 1105.
The Court in Davis reversed and remanded the matter, reasoning:
We do not and need not challenge the State’s interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender. Cf. In re Gault, 387 U.S. 1, 25, 87 S.Ct. 1428, 1442, 18 L.Ed.2d 527 (1967). Here, however, petitioner sought to introduce evidence of Green’s probation for the purpose of suggesting that Green was biased and, therefore, that his testimony was either not to be believed in his identification of petitioner or at least very carefully considered in that light. Serious damage to the strength of the State’s case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State’s policy of protecting a juvenile offender. Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record — if the prosecution insisted on using him to make its case — is outweighed by petitioner’s right to probe into the influence of possible bias in the testimony of a crucial identification witness.
Davis, 415 U.S. at 319, 94 S.Ct. 1105.
B.

ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, Henderson argues that the trial court *229 erred in not allowing the discovery of J.W.’s criminal record to be used as impeachment evidence. Specifically, Henderson maintains that he was denied the right to confront J.W. about his juvenile adjudication and the fact that he was granted probation only after becoming the state’s witness. He argues that at trial he objected in light of Davis v. Alaska when the trial court agreed with the state in concluding that juvenile convictions would not be allowed.
| pFirst, Henderson argues that his Sixth Amendment right was secured by the early case of Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), where the Court reversed and remanded Pointer’s case and concluded that his Sixth Amendment right was violated when he was unable to confront and cross-examine the witness who testified against him. (Pointer was accused and convicted of robbery.)
Further, in relying on La. C.E. art. 609.1, Henderson maintains that he should have been allowed to discredit J.W. by introducing evidence of J.W.’s prior crimes and adjudication so that the jury could form an opinion about J.W.’s character. He concedes that La. C.E. art. 609.1 does not generally permit the introduction of evidence of juvenile adjudications; however, he cites State v. Toledano, 391 So.2d 817, 820 (La.1980), to show that a precedent was set that allows the discovery of juvenile records and maintains that the instant case falls within the ambit of what the court in Toledano concluded:
The extreme importance and constitutional status of the right to confrontation (which includes the reasonable opportunity to impeach the witness’ credibility) requires that any statutory right to confidentiality of juvenile proceedings under these circumstances must yield if the discrediting value of a prior juvenile adjudication is such that its disclosure is essential to a fair trial
Id. at 820.
Further, relying on State v. Hillard, 398 So.2d 1057 (La.1981), wherein the defendant, Kerwin Hillard, was sentenced to life imprisonment for first degree murder and the Supreme Court reversed and remanded the case, concluding that that Hillard’s Sixth Amendment rights may have been violated because the trial court did not allow Hillard to question Robert Johnson, a witness against him, about his juvenile record during cross-examination.
ImLastly, Henderson contends that it was midway through trial that he learned that J.W. was only subjected to probation for agreeing to testify against him, which triggered Henderson’s reliance on La. C.E. art. 607, because Henderson maintains that he could have introduced extrinsic evidence that J.W. was biased or had an interest in testifying.
The state begins by countering Henderson’s argument by also citing Davis v. Alaska and discussing the case in detail. In first distinguishing the case, the state maintains that the defendant Davis attempted to question the witness Green about his probationary status; the Alaskan court sustained the state’s objection because state law made those records confidential. In the instant case, the state argues that Louisiana law also makes such juvenile records confidential,[4] but that the Court in Davis made it clear that exposing *230 the record of a juvenile should be applied on a case by case basis.
Next, the state agrees with Henderson in that the record fails to show that the trial court reviewed and considered J.W.’s juvenile record as required by State v. Perkins, 03-1680, pp. 1-2 (La.6/27/08), 852 So.2d 989, 990, wherein the Court stated:
“The critical question in cases involving a witness’s juvenile record and the sixth amendment right to confrontation is whether the defendant will be precluded from utilizing a method of impeachment that would be effective in the circumstances of his case were the juvenile record available to defendant.” State v. Smith, 437 So.2d 802, 804 (La.1983). In reviewing juvenile records, the issue thus becomes whether the _|nwitness’s juvenile adjudications have such discrediting value that there is a reasonable likelihood it would affect the verdict. State v. Toledano, supra, 391 So.2d at 820. That determination can only be made after an examination of the juvenile record by the trial court and preservation of that record for review. State v. Hillard, 398 So.2d 1057, 1060 (La.1981).
On appeal, Henderson seeks a new trial; however, the state disagrees and argues that the matter should be remanded in light of State v. Toledano and State v. Hillard.
In Toledano, the Court concluded on rehearing that the “matter must be remanded for submission of Reginald Yawls’ record of juvenile adjudications. If the trial court finds, under the principles discussed above, that the circumstances require a new trial, judgment should be entered accordingly. On the other hand, if the trial court decides that the conviction should stand, then the defendant may seek review by this court of that ruling.” Id. at 821.
Further, in Hillard, the Court remanded the case for the trial court to determine “whether the defendant will be prevented from employing a means of impeachment that would be effective in his particular case if the juvenile record cannot be referred to.” Id. at 1060-61.
On 7 January 2013, Henderson actively sought to discover J.W.’s criminal history. The trial court flatly denied Henderson’s discovery motion. Now, both the state and Henderson agree that the trial court failed to review J.W.’s record of conviction and arrests which is inconsistent with Davis.
COUNSEL FOR HENDERSON:
The motion for discovery pursuant to Brady and its progeny, Judge, we had asked the Court months ago to have the state turn over criminal conviction histories of all the potential state witnesses. Specifically, the juvenile witness, [J.W.], but not to exclude any other witnesses.
|12If the Court would like to review the rap sheet in camera. I understand from Mr. Poche he said that the rap sheet is clean, I think those are his words, that there was nothing there. However, we know that Mr. [J.W.] is on probation at this point and so the state should disclose what he is on probation for.
THE STATE:
In response to that, Judge, juvenile convictions do not come in and they can’t even mention that he’s on probation when he is on the stand because that is contrary to what impeachment allows for.
THE COURT:
The Court agrees with the State, I’m not letting juvenile convictions in.
Confrontation errors are subject to the harmless error analysis. State v. Broadway, 96-2659, p. 24 (La.10/19/99), *231 753 So.2d 801, 817; State v. Truvia, 09-0504, p. 14 (La.App. 4 Cir. 1/13/10), 29 So.3d 669, 678. In Broadway, the Court set forth the harmless error analysis for confrontation errors, stating:
The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. Id. at 684,106 S.Ct. 1431. Factors to be considered by the reviewing court include “the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contracting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.” Id. at 684, 106 S.Ct. 1431; State v. Wille, 559 So.2d [1321] at 1332 [La.1990]. The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
Id. at p. 24, 753 So.2d at 817.
In State v. Rubens, 10-1114 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, the defendant, Peter Rubens, was convicted of the second degree murder of his acquaintance, Robert Irwin. After having a disagreement about money, Ruben’s | ^girlfriend, and work, Rubens shot and killed Irwin. On appeal, Rubens sought review, inter alia, of the trial court’s denial of the admission of a juvenile witness’ “rap” sheet. Although this court found the assignment to be without merit because Ruben could not point to specific evidence in the record for appellate review, we found, citing Toledano and Davis:
“[T]he extreme importance and constitutional status of the right to confrontation (which includes the reasonable opportunity to impeach the witness’s credibility) requires that any statutory right to confidentiality of juvenile proceedings under these circumstances must yield if the discrediting value of a prior juvenile adjudication is such that its disclosure is essential to a fair trial.” State v. Toledano, 391 So.2d 817, 820 (La.1980), on rehearing. This standard entails a balancing test to determine whether the impeachment value of the adjudication is outweighed by the State’s interest in maintaining the confidentiality of juvenile records. Davis v. Alaska, 415 U.S. 308, 319, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974); State v. Smith, 437 So.2d 802, 804 (La.1983).
Rubens, pp. 38-39, 83 So.3d at 55-56
We are not presently in a position to determine whether failing to allow Henderson to cross-examine J.W. in regard to his criminal record was harmless error or not. The record is devoid of J.W.’s criminal history, and the trial court failed to examine J.W.’s record prior to denying its admissibility. That Henderson learned that J.W. may have been afforded probation for testifying against him also raises a concern as this might be significant impeachment evidence. We find that, in light of Toledano and Hillard, remand of the instant case is consistent with current law and jurisprudence.
ImC-

ASSIGNMENT OF ERROR NUMBER 2

In his second assignment of error, Henderson argues that he was deprived of his constitutional right of judicial review because the multiple offender exhibits were not lodged in the record and cannot be located. He starts by citing Uniform *232 Rules, Courts of Appeal, Rule 2-1.7, which states:
The record shall include exact copies of all documentary evidence and other evidence (including depositions filed in evidence) in the order in which such evidence was filed. If it is necessary that the original of any evidence be filed, such original must be filed separately and not attached to the record; however, there must be proper reference in the record showing such filing. No record of another case (or prior record in the same titled and numbered case) shall be included in the record, unless such other record has been introduced in evidence (at trial) in the case on appeal or on writs, in which event such other record shall accompany the record as an exhibit.
Henderson contends that he asked specifically for the missing exhibits and learned that not only were the exhibits not lodged, but their whereabouts were unknown. He objected at the multiple bill hearing to the sufficiency of the evidence. After learning that the exhibits introduced at the multiple bill hearing were lost, he correctly questioned how the state could prove the allegations of the multiple bill. Henderson parallels his case to State v. Santee, 02-0693 (La.App. 4 Cir. 12/4/02), 834 So.2d 533, where this court affirmed the defendant’s conviction for possession of cocaine, but vacated his adjudication as a multiple offender and remanded the matter because the defendant objected to the sufficiency of the evidence to prove the allegations of the multiple bill, and the record failed to contain the multiple bill exhibits for this court’s review.
11 ¡According to Henderson, at the 25 February 2012 hearing as to the multiple bill, he challenged whether the state identified him as the person convicted in the district court case numbers 499-787 and 408-666. Now, he cannot challenge his adjudication because the record is devoid of this evidence.
The state agrees that Henderson was told that the exhibits introduced at his multiple bill proceeding were unavailable, not in the record, and therefore are not a part of the record presently before us. Hence, the state agrees that Henderson’s adjudication as a multiple offender must be vacated and remanded.
The record before this court contains the multiple bill and Officer Jay Pacquet’s expert testimony on fingerprints. The state offered other supporting evidence that is not a part of this record.[5] Further, both Henderson and the State agree that the information is unavailable and/or missing. Thus, Henderson’s adjudication and sentence as a multiple offender must be vacated in light of Santee, p. 5, 834 So.2d at 536, citing La. Const. art. I, § 19; State v. Ford, 338 So.2d 107 (La.1976), “because the exhibits are not available, it is impossible to determine the merits of this assignment of error, and whether the State met its burden of proof at the multiple bill hearing. Therefore, the defendant’s adjudication and sentence under the multiple offender statute are vacated.”
Y.

CONCLUSION

The trial court must determine whether harmless error existed in denying Henderson discovery of J.W.’s criminal *233 record and then proceed accordingly. | ^Henderson's sentence as a multiple offender is vacated for the reasons discussed above. This case is remanded for further proceedings.
VACATED IN PART; REMANDED.

. Henderson was also charged with a violation of La. R.S. 14:69, illegal possession of stolen property, which was severed by the trial court on his motion; that matter is not a part of this appeal.

. The record contains testimony regarding both a 1999 robbery, wherein Henderson was the robber, and the 2 January 2012 crime that is the subject of the case at bar.

. Because J.W. is a minor in juvenile detention, we use his initials in lieu of his name in this opinion.

. La. Ch. C. art. 412(A) states:
Records and reports concerning all matters or proceedings before the juvenile court, except traffic violations, are confidential and shall not be disclosed except as expressly authorized by this Code. Any person authorized to review or receive confidential information shall preserve its confidentiality in the absence of express authorization for sharing with others.

. Henderson was multiple billed on 25 February 2013. The minute entry references the state's exhibits, i.e., finger prints; arrest registers from July 1999, June 1999, and August 2011; and certified court documents in case numbers 409-335, 408-666, and 449-787. The record before us fails to contain these exhibits.