STATE OF LOUISIANA     *     NO. 2022-KA-0628

VERSUS     *

WILLIAM A. MCDONOUGH     *     COURT OF APPEAL

    FOURTH CIRCUIT

    *     STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 546-035, SECTION "B"
Honorable Tracey Flemings-Davillier, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Dale N. Atkins, Judge Nakisha Ervin-Knott)

**LEDET, J., CONCURS IN THE RESULT**

Jason R. Williams, District Attorney
Brad Scott, Assistant District Attorney, Chief of Appeals
Thomas Frederick, Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
P.O. Box 4015
New Orleans, LA 70178

      COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**
**October 27, 2023**

DNA

NEK

This is a criminal case. Defendant, William McDonough (hereinafter "Mr. McDonough"), appeals his conviction and sentence for second degree rape. For the following reasons, we affirm Mr. McDonough's conviction and sentence.

## STATEMENT OF CASE

### *FACTUAL BACKGROUND*

In September 2016, C.W.[1] worked as an attorney and piano teacher while living in New Orleans, Louisiana. At that time, C.W. met Mr. McDonough on Tinder, a dating app, and they agreed to go on a first date to a concert on September 15, 2016. At the end of the date, C.W. agreed to go with Mr. McDonough to his condominium to eat some food and watch television. However, while at Mr. McDonough's condominium, C.W. and Mr. McDonough engaged in sexual intercourse, which C.W. maintains was without her consent. C.W. left Mr.

_____

[1] Because of the nature of the crimes alleged herein, this Opinion will refer to all of the alleged sex offense victims by their initials to protect their identities. *See* La. R.S. 46:1844(W)(1)(a) (providing that "[i]n order to protect the identity and provide for the safety and welfare of . . . victims of sex offenses . . . all public officials and officers and public agencies, including but not limited to . . . judicial officers, . . . shall not publicly disclose the name, address, contact information, or identity of . . . victims of sex offenses . . . ."). Additionally, this Opinion uses initials for individuals referenced herein who are connected with C.W. (i.e., C.W.'s sister, friend, and former fiancé) in an effort to maintain C.W.'s privacy.

1

McDonough's condominium in the early hours of September 16, 2016, and went to University Medical Center ("UMC") later that same day to undergo a Sexual Assault Forensic Exam ("SAFE"). Eleven days later, on September 27, 2016, C.W. reported the rape to the New Orleans Police Department (hereinafter "NOPD"). Mr. McDonough was charged with second degree rape of C.W. on December 16, 2016, and pled not guilty on arraignment.

After reading a news article about Mr. McDonough's arrest for rape in 2016, M.M. came forward in 2017 to report that she had been sexually assaulted by Mr. McDonough in 2014. Like C.W., M.M. met Mr. McDonough on Tinder and went on one date with him. M.M. stated that she did not recall all of the events of that night but that she did remember waking up in Mr. McDonough's bed naked the next morning and feeling sore between her legs. Additionally, Mr. McDonough's former girlfriend, L.K., reported to the NOPD that Mr. McDonough had raped her on two occasions and battered her on one occasion in 2019.

### BILLS OF INFORMATION AND ARRAIGNMENTS

The State of Louisiana (hereinafter the "State") first initiated criminal proceedings against Mr. McDonough on December 1, 2016, and charged him with a violation of La. R.S. 14:42.1, second degree rape, against C.W. Mr. McDonough pled not guilty. Subsequently, on May 19, 2019, a warrant was issued for Mr. McDonough's arrest for violations of La. R.S. 14:42.1, second degree rape, and La. R.S. 14:34.9, battery upon a dating partner, L.K. A protective order was issued on behalf of L.K. against Mr. McDonough on May 1, 2019. On May 30, 2019, the State filed a superseding indictment against Mr. McDonough which charged him with counts relating to the offenses against L.K. and M.M., in addition to C.W. On June 26, 2019, the State filed a second superseding indictment and charged Mr.

2

McDonough with six counts: 1) the second degree rape of L.K.; 2) violation of protective orders issued for L.K.; 3) second degree battery of L.K.; 4) second degree kidnapping of M.M.; 5) second degree rape of C.W.; and 6) second degree rape of J.D. Mr. McDonough pled not guilty to all of the counts in the second superseding indictment on July 22, 2019.

The State proceeded to trial on March 14, 2022, solely on count three, the second degree rape of C.W. On March 18, 2022, by unanimous jury verdict, Mr. McDonough was found guilty as charged for the second degree rape of C.W.

## MOTION FOR NEW TRIAL AND SENTENCING

On April 14, 2022, Mr. McDonough filed a Motion for a New Trial, which the district court denied the same day. After denying Mr. McDonough's Motion for New Trial, the district court asked Mr. McDonough if he waived the 24-hour sentencing delay. Defense counsel stated that he would waive the statutory delays, and the district court proceeded with Mr. McDonough's sentencing.

C.W., her mother, and her fiancé all gave victim impact statements. In her victim impact statement, C.W. explained that she suffered "horror and agony" in the years since the sexual assault, including suffering panic attacks, depression, thoughts of suicide, and she feared that she could not go back to the practice of law because of her trauma. C.W. further described how she had received continuous care from a psychologist and psychiatrist and even went to an inpatient trauma center for 28 days. C.W. requested that Mr. McDonough be put "in prison and on the sex offender registry for as long as possible . . . ."

Mr. McDonough also provided a statement during sentencing, wherein he explained:

I guess really I wanted to testify at trial. I was advised by my attorney to not testify. I wanted to tell my side of the story. You know, suffice it to say there are a lot of details that were glossed over or admitted. I feel like [C.W.] glosses over the fact that she lured me upstairs, even wagging her finger at me, hey, big boy, after we were already having sex downstairs. She never said no. She never told me to stop. But what she did do is go berserk and start screaming at me after the fact.

Following Mr. McDonough's statement, the district court sentenced Mr. McDonough to thirty years hard labor without the benefit of probation, parole, or suspension of sentence and with credit for time served. After the sentencing, defense counsel objected to the sentence and orally moved for the district court to reconsider sentence. The district court denied the motion. Defense counsel made an oral motion for appeal, which the district court granted. Before proceeding to the merits of the appeal, we will provide greater detail about the trial itself.

## TRIAL

### THE STATE'S CASE IN CHIEF

The State presented seven witnesses, namely Dr. Colin Devlin (hereinafter "Dr. Devlin"); Brian Allred (hereinafter "Mr. Allred"); Detective Sergeant Claudia Bruce (hereinafter "Detective Bruce"); M.M.; C.W.'s sister, A.W.; C.W.; and C.N. The State also entered twenty-two exhibits into evidence.

### Testimony of Dr. Devlin and Stipulation Regarding DNA evidence

The State called Dr. Devlin as its first witness. After providing his credentials and being subjected to cross-examination by defense counsel, the district court qualified Dr. Devlin as "an expert with respect to emergency room medicine, therefore, he could testify . . . [to] treatments in the emergency room to the extent it includes trauma and/or affect."

As part of his duties as an emergency room physician, Dr. Devlin conducted SAFE exams. Dr. Devlin testified that he was working as an emergency room

physician at UMC on September 16, 2016, and performed a SAFE exam on C.W. Dr. Devlin explained that he took C.W.'s medical history, collected C.W.'s clothing, took pictures of her, and completed a full physical exam, including swabbing various areas of her body. Dr. Devlin testified that the absence of an injury when conducting such exams was not unusual.

According to Dr. Devlin, during the SAFE exam, C.W. recounted the details of the sexual assault to him. Dr. Devlin testified that C.W. told him that Mr. McDonough had given her half a "molly," but that she did not feel any effects from the drug. Dr. Devlin also stated that he took notes during the exam, including that C.W. had bruising on her thighs, but that C.W. was not sure if the bruising was from her encounter with Mr. McDonough or from a sexual encounter that had occurred earlier in the week. Additionally, Dr. Devlin noted the bruises were in various stages of healing; and he agreed that some of the bruises were old while some of the bruises were new. Dr. Devlin further testified that C.W. identified Mr. McDonough as her rapist during the SAFE exam.

Following Dr. Devlin's testimony, a stipulation was read into the record regarding the testimony of Andrew Ingram (hereinafter "Mr. Ingram"), an expert in forensic DNA analysis. The stipulation provided that Mr. Ingram "analyzed the evidence from the sexual assault kit of C.W. . . . [and] determined that the DNA recovered from C.W.'s two left thigh swabs belonged to William McDonough." Further, Mr. Ingram "determined that the DNA recovered from C.W.'s two right thigh swabs belonged to William McDonough."

5

***Testimony of Mr. Allred***

The State's next witness was Mr. Allred, Mr. McDonough's good friend. Mr. Allred stated that he had known Mr. McDonough since 2002. Mr. Allred testified regarding text messages and a fifteen minute phone call he had with Mr. McDonough on September 16, 2016, regarding Mr. McDonough's date with C.W. Mr. Allred explained that because Mr. McDonough was upset about how the date ended and that C.W. would not return his phone calls, he asked Mr. McDonough questions about what might have gone wrong during the date. Mr. Allred stated, "I wanted to help him figure out why she left so abruptly. So I just asked him, you know, a logical series of questions, went through a process to try to figure out what happened on that date." His conversation with Mr. McDonough culminated in the following text exchange:

> MR. MCDONOUGH: I couldn't help getting in that p---y. It was so good.
>
> MR. ALLRED: Did you rape her?? [sic]
>
> MR. MCDONOUGH: No.

Mr. Allred also testified that he exchanged further text messages with Mr. McDonough, stating that he hoped that Mr. McDonough had not been aggressive with C.W. Mr. McDonough responded, "I might have. She was like 'I like that you are aggressive' and then we would stop. Then start kissing again. Ugh."

Further, Mr. Allred testified about an encounter he witnessed between Mr. McDonough and a woman with whom Mr. Allred had gone on a date, "Rae." Mr. Allred admitted that he texted Mr. McDonough on September 14, 2016, that Mr. McDonough "almost raped Rae" and that Mr. McDonough was "feeling her a-s and t--s the whole ride to [Mr. Allred's] apartment." Additionally, Mr. Allred confirmed that he texted Mr. McDonough: "Don't ever forget if I feel your date's

6

a-s or t--s." Both the text messages regarding Rae and Mr. McDonough's date with C.W. were entered into evidence.

***Testimony of Detective Bruce***

Next, the State called Detective Bruce to testify. Detective Bruce testified that she was assigned to the NOPD Sex Crimes Division in 2016. In that capacity, Detective Bruce met with C.W. on September 27, 2016, after she was advised by a sexual assault victim's advocate that there was a victim of sexual assault who wished to report an incident. According to Detective Bruce, C.W. provided her with "very detailed information about her rape and what had occurred that night . . . ." She further testified that C.W. identified Mr. McDonough by name and through a photographic lineup. Detective Bruce stated she learned that a buccal swab was obtained from Mr. McDonough and that it was sent to the Louisiana State Police Crime Lab for DNA testing, along with the swabs taken from C.W. during the SAFE exam. Detective Bruce stated that she also later learned "that there was a match between the reference sample of [Mr. McDonough]" and the swabs taken from C.W.

Additionally, Detective Bruce provided details about her investigation of C.W.'s allegations, including interviews with C.W., C.W.'s two sisters, and a friend to whom C.W. had reported the rape, H.R. Detective Bruce also explained that she sent C.W.'s phone to the Digital Forensics Unit so that her text messages with Mr. McDonough and others could be retrieved.

Detective Bruce further testified that she interviewed M.M., who reported that Mr. McDonough had raped her in 2014. Detective Bruce explained that M.M. told her she did not remember all of the details of her night with Mr. McDonough but did recall that she had been intoxicated and woke up naked in his bed.

7

Additionally, Detective Bruce testified that she interviewed L.K., who stated that Mr. McDonough battered and raped her when they were dating partners in 2019. Specifically, Detective Bruce testified that L.K. reported two assaults committed by Mr. McDonough, one on February 18, 2019, and another on March 23, 2019. L.K. also provided Detective Bruce with medical records from a visit to the emergency room where she was diagnosed with rib fractures and a concussion, which L.K. explained were caused by Mr. McDonough during one of the sexual assaults.

Next, Detective Bruce testified that she obtained search warrants for Mr. McDonough's electronic devices, which revealed text messages that Mr. McDonough had exchanged with Mr. Allred, C.W., and other individuals. She identified text messages from Mr. McDonough to C.W., which were introduced into evidence and shown to the jury. The text messages revealed that C.W. left Mr. McDonough's condominium in the early hours of September 16, 2016, and that Mr. McDonough immediately started texting her:

"Let me call the Uber[.]"

"Baby, please be safe."

"Just tell me you are ok. Nite nite [sic]."

Later that day and early on the morning of September 17, 2016, Mr. McDonough sent C.W. the following text messages:

"Baby. I'm sorry if you are mad. Please call me[.]"

"[C.W.], please talk to me. That was so out of character for me and I'm sorry. I was just wasted. I really enjoyed your company. I hope we can move past this if you are mad. I honestly have no idea. And be safe drinking [sic] to see your mommy. It's going to rain. Hope all is well……"

Detective Bruce further testified that C.W. did not respond to any of Mr. McDonough's text messages.

On cross-examination, Detective Bruce admitted that she did not go inside Mr. McDonough's condominium to take pictures, collect DNA or any other physical evidence, and did not question any security guards about any interactions they may have witnessed between C.W. and Mr. McDonough. Detective Bruce explained that there was likely no DNA evidence at Mr. McDonough's condominium because of the delay between the sexual assault and C.W.'s reporting to the NOPD.

Continuing on cross-examination, Detective Bruce testified about text messages exchanged between C.W. and her former fiancé, G.T., on September 15, 2016, wherein C.W. stated, "My thighs are covered in bruises from your hands, actually." Detective Bruce admitted that she did not interview G.T. during her investigation. Next, defense counsel questioned Detective Bruce about a text C.W. sent to her friends, in which C.W. stated, "I think I was raped" and "I think I was just raped."

In response to defense counsel's questioning, Detective Bruce stated that lab results from the blood taken from C.W. during her SAFE exam showed that C.W. did not have alcohol or any illegal drugs in her system. Defense counsel also questioned Detective Bruce as to why she did not direct that a toxicology analysis be performed given C.W.'s claim that Mr. McDonough had given her a "molly." Detective Bruce responded that she requested that such testing be performed; however, she did not think it was particularly relevant because C.W. informed her that the drug "had no effect on her" and that C.W.'s "account of the rape wasn't

9

based on her being intoxicated or drugged." Rather, as Detective Bruce explained, C.W.'s "account of the rape was that it was a forced situation."

***Testimony of M.M.***

M.M. testified that she was a licensed professional counselor living and working in New Orleans. M.M. stated that she met Mr. McDonough on Tinder in 2014. She testified that she was staying with friends in the same building where Mr. McDonough was living and that they went to a bar for their first date. M.M. recalled that Mr. McDonough "was kind of being a little aggressive with making, like, sexual innuendos" and that she "[told] him that [she] would not be having sex with him . . . ." M.M. explained that she left the first bar with Mr. McDonough and went to another bar, One Eyed Jacks. At that time, M.M. had consumed two to three glasses of wine, but testified that Mr. McDonough began "shoving shots in [her] face." Further, M.M. explained, "I mean, I was like, I don't want - - I don't want any more of this. I'd done one shot, but it was constant. It was after one shot, he is trying to pour another shot, another shot, another shot. And it was too much."

M.M. stated that when she told Mr. McDonough that she was ready to leave One Eyed Jacks, he told her that they needed to go to dinner because M.M. was drunk and that he needed to help her walk back to their building. M.M. testified that she and Mr. McDonough walked back to their building together. She explained that when they arrived at the building, Mr. McDonough directed her to his floor of the building, telling her that she was too drunk to be by herself. M.M. testified that she recalled telling Mr. McDonough that she did not want to go with him. She explained that there were some parts of the night that were "fuzzy" and other parts that were "vivid." However, M.M. testified that she did not remember

everything from that night and explained: "I think for a while I wanted to forget that it happened. And so you kind of try to put it out of your head . . . ."

Further, M.M. testified that she ended up in Mr. McDonough's apartment. She described the layout and stated:

> The vivid part of that night is -- I do remember being in his -I remember being in his bed. I remember him taking my clothes off, and I remember saying no. And I do remember saying no. And I remember him being on top of me, but I remember I felt heavy, because - -

M.M.'s testimony was then cut off by defense counsel's objection and motion for a mistrial. After a discussion off the record, the district court sustained the objection, stating that "the State and the defense understand the confines of the testimony that is allowed at this time." M.M. then continued her testimony, stating that she woke up without any clothes on and "immediately knew something had happened." She testified, "I was hurting. I was very sore between my legs. I felt disgusted, and I just wanted to go -- I wanted to go home. I remember getting up and telling him he was a rapist and just hurrying up, get[ting] dressed and leaving."

M.M. explained that she had forgotten her sweater at Mr. McDonough's apartment, so she texted one of his friends that she had met the night before, who recovered M.M.'s sweater and brought it to her. M.M. testified that she told Mr. McDonough's friend that Mr. McDonough had raped her and that she had told Mr. McDonough no, but that "he forced himself on [her], and then raped [her]."

Next, M.M. testified about her encounters with Mr. McDonough following the sexual assault. M.M. stated that she saw Mr. McDonough at One Eyed Jacks with another woman, whom she described as very intoxicated, and observed that Mr. McDonough was giving her shots of alcohol. M.M. explained that she approached Mr. McDonough and called him a rapist, while also warning the other

11

woman that Mr. McDonough was going to rape her. Additionally, M.M. described another incident when she saw Mr. McDonough at a bar with one of her friends. She stated that she again called Mr. McDonough a rapist and that, in response, he turned to her and smiled. Further M.M. testified that Mr. McDonough had sent her a message to stop calling him a "rapist" in public.

M.M. explained that she did not initially report the rape to police because she blamed herself for getting drunk. However, she testified that after seeing Mr. McDonough's picture on the news in 2016, she felt "triggered" because of the similarities between her encounter with Mr. McDonough and the allegations of the other victim, specifically that they both met Mr. McDonough on Tinder, went to One Eyed Jacks with him, and were raped by him on their respective first dates. M.M. then testified that she went to the District Attorney's office and reported the rape in early 2017.

On cross-examination, M.M. stated that she met with Detective Bruce only once and recalled giving a recorded statement. She admitted that the first time she gave a statement regarding the rape she told Detective Bruce that she did not remember anything after leaving One Eyed Jacks. However, M.M. testified that she was able to recall more details of the rape after sitting and thinking about it. M.M. clarified that her memory of the rape was fuzzy at first because she did not want to think about it, but since she reported the allegations to police, she had to really think about what happened and "things came back in [her] memory."

### Testimony of A.W.

A.W., C.W.'s youngest sister, testified that C.W. texted her early on the morning of September 16, 2016, and told her, "I think I was just raped." A.W. immediately called her sister, who sounded panicked and was hysterically crying.

12

A.W. testified that she was concerned for her sister's safety, so she helped her call a car to get a ride home. She stated that while on the phone with her sister, C.W. "kept repeating herself over, and over, and over again saying I think I was just raped. I said no. I should have fought harder." When questioned about whether she had spent time with C.W. following the rape, A.W. testified:

> I spent three about three months with her, because I saw her struggling intensely. She was scared to take a bath. She was scared to be naked alone at any point. She was scared to walk her dog, whether it was broad daylight or at night. She was scared to leave her bed.

### Testimony of C.W.

C.W. testified that at the time of the sexual assault, she was working as an attorney and piano teacher in New Orleans. C.W. stated that she met Mr. McDonough on Tinder; they exchanged "playful" text messages; and she agreed to go to a concert with Mr. McDonough for their first date on September 15, 2016, a Thursday. C.W. testified that she wore a knee-length black and white dress that was form-fitting to the date. Also, C.W. explained that she was five feet four inches tall and weighed between 100 and 110 pounds at the time of her date with Mr. McDonough. C.W. testified that she met Mr. McDonough at a hotel bar prior to the date, where they had a couple of drinks and some light appetizers. While at the concert, C.W. had another drink. She testified that Mr. McDonough also gave her half of a "molly" but that she did not feel inebriated. She stated that she and Mr. McDonough kissed and took pictures together at the concert.

According to C.W., before the concert ended, she and Mr. McDonough went to One Eyed Jacks. She testified that Mr. McDonough bought her a drink while they were at One Eyed Jacks and that she felt a "buzz," so she switched to water. C.W. explained that at one point, Mr. McDonough pulled her aside and said,

"[L]et's go." C.W. testified that she told Mr. McDonough that "[she] did not want to go to his apartment, because [she] was not going to have sex with him that night." C.W. stated that she told Mr. McDonough that she would not have sex with him multiple times so that it would be clear. However, C.W. testified that she agreed to go to Mr. McDonough's condominium after he finally "wore her down" by promising her that they would just watch a television show and eat leftover spaghetti. C.W. stated that she was hungry; so she agreed to leave with Mr. McDonough, and they took an Uber to his condominium.

C.W. testified that when she arrived at Mr. McDonough's condominium, they were "flirting and kind of being silly and playful." They first went to Mr. McDonough's kitchen, and C.W. testified that she was focused on getting some food. Instead of getting out the food, C.W. stated that Mr. McDonough started kissing her aggressively on her neck and mouth with his tongue. She recalled that Mr. McDonough had his hands all over her and that he picked her up and put her on the kitchen counter. C.W. explained that "[she] remember[ed] feeling like [she] was already out of control" and tried to "defuse" the situation by walking out of the kitchen and going to the couch to wait for Mr. McDonough to bring the food or put on the television show. However, C.W. testified that Mr. McDonough followed her to the couch and "continued to be more handsy [sic] and aggressive than [she] was comfortable with . . . ." She stated the she tried to distract Mr. McDonough by asking for a tour of his condominium. C.W. stated that she saw a spiral staircase and thought that it led to a "man cave" or area with a pool table.

C.W. testified that, subsequently, she "foolishly" went up a narrow spiral staircase, into a loft area where "there [wa]s nothing but a bed." Mr. McDonough was directly behind her on the staircase and blocking her path, such that she could

14

not get back downstairs. C.W. sat on the bed, at which time Mr. McDonough "approached [her] and started making out with [her] . . . touching [her] in various places. At some point, he took off [her] clothes." C.W. stated, "I didn't tell him to stop at that point, but I was getting increasingly uncomfortable. At that point, he threw my clothes over the balcony from the lofted area, so I did not have clothes to put on." C.W. then described the sexual assault committed by Mr. McDonough:

> He started kissing me in other parts of my body, and then performed cunnilingus on me. And I remember I think it hurt. It was unpleasant. I didn't like it. So I think I asked him to stop. At some point, he tried to get me to put my mouth on his penis, but I just shook my head no. And then I remember pretty clearly that we were -- he had me on my back, and we were making out, and he was on top of me kind of with, like, his hands planted on either side of my head like that. (indicating.) And then he takes my hand down to touch his penis, and I start to realize what he intends to do with it, and I start saying no, I don't want this or just no. And I didn't really fully believe that he was going to actually do -- I thought no would be enough. But he then penetrated me in my vagina and proceeded to use me like an object, like an inanimate object for his pleasure.

C.W. also described how Mr. McDonough was moving her around "like a doll." She further testified, "At one point, he picked me up and was standing up having -- penetrating me. I was saying no over and over again, but I felt like I had no control over my body or that he was just completely -- he was huge." C.W. stated that she said "no" to Mr. McDonough multiple times:

> Before he penetrated me, I told him no, and after he continued, I repeated no over and over and over again, like, it was -- I was a broken record. I thought just the fact I kept saying no maybe he would snap out of it or something would change. At some point, he did stop when he was standing with me. I think I kind of pushed a little bit and maybe scratched him a little, but not -- I was too frightened to really -- I don't even know if I was -- I was just frozen. But he let me down and then stopped having sex with me. He was, like, okay, okay, okay, let's just go watch the TV.

As explained by C.W., she and Mr. McDonough eventually moved downstairs to the couch. At that point, C.W. explained that she could not find her

clothing, so Mr. McDonough gave her "a leopard kind of sheer negligee." C.W. felt compelled to wear it "because [she] didn't know where [her] clothes were and because [she] just didn't really feel like [she] had a choice in what [she] was doing." C.W. then laid on the couch and wrapped herself in a blanket, recalling that "[she] just wanted to curl up in a ball and disappear, basically." C.W. stated that Mr. McDonough moved the blanket and negligee aside and began raping her again, stating that C.W. was "so hot" and that he couldn't resist her. C.W. testified:

> And he started penetrating me again while in the spinning I guess position. And then he -- again, I started saying no over and over again. At some point, he had me turned over facedown, I'm still saying no over and over again. I feel like he moved me around a lot. I don't have a lot of -- but I just know I kept saying no, and if I kept saying no something might change. And then at one point, I remember I decided to go -- what I thought was the riskiest move was I reminded him that he had daughters, and I thought at that point that I was actually risking my life, because sometimes people can become enraged when, you know, when you mention their children. But it didn't phase him, and he continued, and I was just crying and saying stop.

> At the time when I believe he ejaculated, I was on my back on the couch, and he was maybe on the floor on his knees maybe. I got the impression that he had ejaculated, and I kind of switched my from no, no, no to did you come in me, did you come in me, like, asking him over and over again, because I was, like, a little incredulous, and also I wanted to know. But he didn't really respond. He was just kind of saying things like all right, all right, all right, and went and got a towel for me and a towel for himself, like a hand towel. And was just kind of saying things to pacify me. Like, shh and that kind of thing.

C.W. further testified that after she left Mr. McDonough's condominium, she texted her sister, friends, and ex-fiancé that she thought she had just been raped. C.W. testified that she spoke with her sister on the phone and took a car home. Once she got home, C.W. stated she slept for a couple hours, but she was awakened by her friend, H.R., who took C.W. to UMC for a sexual assault exam. C.W. further testified that she was ashamed and blamed herself for the assault, but she later reported the rape to police. She testified that she met with Detective Bruce

and gave her a statement along with the text messages she had exchanged with Mr. McDonough.

On cross-examination, C.W. reiterated that she was not intoxicated during her date with Mr. McDonough and that she did not feel any effects from the half pill of "molly" that Mr. McDonough had given her. She also repeated that she had been dancing with and kissing Mr. McDonough while they were at the concert.

Further, on cross-examination, C.W. stated that she was touching Mr. McDonough while they were kissing in the kitchen. She admitted that Mr. McDonough did not threaten her, use force, or have a weapon to get her into his condominium. C.W. conceded that Mr. McDonough did not force her up the stairs to the loft and that she did not tell him that she wanted to go back downstairs. She stated that when Mr. McDonough began kissing her, she did not object. C.W. admitted that Mr. McDonough stopped performing oral sex on her when she told him to stop. She testified that Mr. McDonough was not holding her down when he attempted oral sex but that she felt "trapped." C.W. stated that she did not scream for help but kept telling Mr. McDonough "no." Additionally, C.W. testified that she "felt like [she] could not get away from him" and did not "remember if he was holding [her] down." C.W. explained that she felt "boxed in" because Mr. McDonough was in a "pushup position" over her.

C.W. continued to explain that Mr. McDonough eventually stopped penetrating her after she "pushed or struggled" and laid down. She described how Mr. McDonough was standing up while he was penetrating her and that she thought she lightly scratched his back but was too scared to scratch harder. When they moved downstairs, C.W. testified that Mr. McDonough began penetrating her from behind after she laid on the couch. She admitted that Mr. McDonough did not

17

verbally threaten her but that she "felt trapped both by his size and his positioning."

Defense counsel questioned C.W. about her ex-fiancé, G.T., and she stated that she texted him, her sisters, and several friends that she had been raped. C.W. admitted that she had some bruising on her legs before she went on the date with Mr. McDonough but that she did not know if any of the bruises were from her prior sexual encounter with G.T. C.W. also admitted that she had filed a civil suit against Mr. McDonough as a result of this sexual assault. On redirect, C.W. testified that she felt trapped and afraid during the rape. Also, as described during her testimony on direct examination, C.W. reiterated that the rape was forceful and against her will.

### Testimony of C.N.

Last, the State called C.N., Mr. McDonough's ex-wife, as a witness. C.N. testified that she had been married to Mr. McDonough for fifteen years before they divorced in 2012. She described an incident that occurred with Mr. McDonough while they were still married in 2010 and when attending a Christmas party at another married couple's house. According to C.N., Mr. McDonough tried to persuade her to spend the night at the couple's house, but she refused and Mr. McDonough reluctantly agreed to leave. C.N. testified that after they left the party and returned home, she was awakened in her bed by the husband of that couple. C.N. explained that she jumped out of bed and started screaming. She looked through the house where she found Mr. McDonough having intercourse with the wife of that couple in their daughter's room. After the couple left C.N.'s house, C.N. stated that Mr. McDonough told her that "he wanted [them] to be swingers." C.N. testified that she responded, "I don't want to be a swinger."

C.N. further testified that she had a phone call with Mr. McDonough on a later date where they discussed that night. The audio recording of that phone call was played for the jury. C.N. stated on the recording, "You sent someone into my bed, William, to have sex with me and you had sex with someone upstairs in our house, okay. There's something sick wrong with that, and you know, don't you?" Mr. McDonough did not deny that the incident occurred, stating, "That was totally out of the box." During the recording, C.N. also accused Mr. McDonough of having a sexual addiction, to which he responded, "All men do."

## *MR. MCDONOUGH'S CASE IN CHIEF*

Mr. McDonough did not call any witnesses or enter any exhibits into evidence in his case in chief.

## ERRORS PATENT

In accordance with La. C.Cr.P. art. 920, we review all appeals for errors patent. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2). Upon review of the record, we find no errors patent.

## DISCUSSION

## *ASSIGNMENTS OF ERROR*

Mr. McDonough assigns four counseled errors on appeal:

1. There is insufficient evidence to support [Mr.] McDonough's conviction for second degree rape;

2. Mr. McDonough's constitutional rights were violated when his attorney was forced to exercise peremptory challenges to remove three prospective jurors who should have been removed for cause;

19

3. Mr. McDonough's constitutional rights were violated by the [district] court's limitation of defense counsel's cross-examination of the police detective and the victim; and

4. Mr. McDonough's thirty-year sentence for second degree rape is excessive under the circumstances, particularly since the [district] court ordered the entire sentence to be served without benefits [sic].

Mr. McDonough also assigns four *pro se* errors on appeal:

1. The Right to testify. Mr. McDonough was denied the right to testify by his attorney.

2. In the testimony surrounding M.M.: Whether the district judge[']s ruling clearly forbidding [t]he State's request to introduce "newly developed" testimony constitute[s] Reversible Error, considering [t]he State simply ignored the above ruling. The introduction of this contradictory [and] inflammatory inadmissible testimony went far and wide outside the judge's ruling to stay within the [four] corners of the [NOPD] Police report.

3. Whether the district judge's de facto life sentence of 30 years without benefits [sic] is unduly harsh considering the agreed upon facts of his case [and] Mr. McDonough's history of living a life free of any criminal activity.

4. Whether the Orleans Parish District Attorney engaged in [p]rosecutorial [m]isconduct when admitting they were in possession of attorney-client communications and had known this fact for at least 3 years.

We discuss Mr. McDonough's counseled assignments of error in order. Mr. McDonough's third counseled assignment of error and second *pro se* assignment of error will be discussed together because they both raise the same issue that Mr. McDonough's sentence was excessive. Mr. McDonough's first, second, and fourth *pro se* assignments of error will then be discussed in turn.

### Counseled Assignment of Error No. 1: Sufficiency of the Evidence

In his first counseled assignment of error, Mr. McDonough argues that there was insufficient evidence to support his conviction for second degree rape. In

particular, Mr. McDonough contends that the State's evidence did not establish that Mr. McDonough used force or made threats against C.W. and that it was not reasonable for C.W. to believe that resistance to the act was futile.

As this Court has previously explained, if an appellant raises a sufficiency of the evidence argument and alleges other trial errors, then the reviewing court should first resolve the sufficiency of the evidence issue. *State v. Dukes*, 2019-0172, p. 7 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 751. This is because "the accused may be entitled to an acquittal" thereby eliminating the need to discuss the accused's other assignments of error. *State v. Groves*, 2020-0450, p. 21 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 971 (quoting *State v. Hearold*, 603 So.2d 731, 734 (La. 1992)). Accordingly, we review Mr. McDonough's claim regarding the sufficiency of the evidence first.

As we explained in *Dukes*, "Louisiana appellate courts apply the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)" in their review of sufficiency of the evidence claims. 2019-0172, p. 7, 281 So.2d at 752. That is, appellate courts review sufficiency of the evidence claims "by determining whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that all of the elements of the offense had been proven beyond a reasonable doubt." *Groves*, 2020-0450, p. 21, 323 So.3d at 971 (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *State v. Tate*, 2001-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928). The principal notion behind a *Jackson v. Virginia* review is rationality. *Dukes*, 2019-0172, p. 7, 281 So.3d at 752 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988)). In this regard, an appellate court must consider the whole record "because a rational trier of fact would consider all [of] the evidence." *Id.* Additionally, the

appellate court is to presume that the actual trier of fact "acted rationally until it appears otherwise." *Id.* Under this standard, "[i]f rational triers of fact could disagree as to the interpretation of the evidence," then the "view of all the evidence most favorable to the prosecution must be adopted." *Id.* at pp. 7-8, 281 So.3d at 752 (citing *Mussall*, 523 So.2d at 1310; *State v. Egana*, 1997-0318, p. 6 (La. App. 4 Cir. 12/3/97), 703 So.2d 223, 228; *State v. Green*, 588 So.2d 757, 758 (La. App. 4th Cir. 1991)). An appellate court does not assess the credibility of witnesses or reweigh the evidence because "[c]redibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the trier of fact." *Id.* at p. 8, 281 So.3d at 752 (citing *State v. McGhee*, 2015-2140, p. 2 (La. 6/29/17), 223 So.3d 1136, 1137; *State v. Scott*, 2012-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508). Likewise, "conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency," and "[s]uch a determination rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." *Id.* (quoting *Scott*, 2012-1603, p. 11, 131 So.3d at 508). As long as there is no "internal contradiction or irreconcilable conflict with the physical evidence," then "a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." *Id.* (quoting *State v. De Gruy*, 2016-0891, p. 11 (La. App. 4 Cir. 4/5/17), 215 So.3d 723, 730).

Additionally, this Court has previously explained that the *Jackson v. Virginia* standard applies to both direct and circumstantial evidence. *Id.* (citing *State v. Wade*, 39,797, p. 7 (La. App. 2 Cir. 8/9/05), 908 So.2d 1220, 1224). If a conviction is based on circumstantial evidence, La. R.S. 15:438 explains that "[t]he rule as to circumstantial evidence is" that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable

22

hypothesis of innocence." It is important to note that the standard found in La. R.S. 15:438 is not a stricter standard than "the more general rational juror's reasonable doubt formula," i.e., the *Jackson v. Virginia* standard. *State v. Toups*, 2001-1875, p. 3 (La. 10/15/02), 833 So.2d 910, 912 (citing *State v. Porretto*, 468 So.2d 1142, 1146 (La. 1985)). Rather, La. R.S. 15:438 serves as "an evidentiary guide for the jury when considering circumstantial evidence." *Id.* That is, "[u]ltimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." *Porretto*, 468 So.2d at 1146. In reviewing circumstantial evidence, the trier of fact must consider:

> the circumstantial evidence in light of the direct evidence, and vice versa, [and] the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*Dukes*, 2019-0172, p. 9, 281 So.3d at 752-53 (alteration in original) (quoting *State v. Rose*, 2005-0396, p. 2 (La. App. 4 Cir. 4/13/07), 955 So.2d 270, 272). Therefore, we review the record to ascertain whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of second decree rape.

After a jury trial, Mr. McDonough was found guilty of one count of second degree rape.[2] Louisiana Revised Statutes 14:42.1 defines second degree rape as:

---

[2] After the sexual assault on C.W. described herein, the Legislature amended La. R.S. 14:42.1 (titled "Second degree rape") with the new version of the statute taking effect on August 1, 2020. However, the amendment did not change Sections

23

A. Second degree rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.

To convict a defendant of second degree rape under subsection (A)(1), the State must prove that the defendant committed an act of oral or vaginal sexual intercourse with the victim without her lawful consent, and the victim was "prevented from resisting . . . by force or threats of physical violence." *State v. McFarlin*, 54,754, p. 4 (La. App. 2 Cir. 1/25/23), 354 So.3d 888, 891 (citing *State v. Disedare*, 2019-810, p. 9 (La. App. 3 Cir. 5/13/20), 298 So.3d 342, 350).

As an initial matter, Mr. McDonough asserts that the State did not present a case under subsection (A)(2) because there was no evidence that C.W. was intoxicated at the time of the incident. The State disagrees and argues that the jury could have found Mr. McDonough guilty under subsection (A)(2) because C.W. testified that Mr. McDonough gave her half a "molly" and bought her several alcoholic drinks. However, C.W. testified at trial that she did not feel any effects from the "molly" and that she was not in any way impaired during the sexual

(A) and (C) of the statute. Rather, the 2020 alterations were only to Section (B) of La. R.S. 14:42.1, which is discussed later in this Opinion.

We note that in La. R.S. 14:42.1, second degree rape is also referred to as "forcible rape." Louisiana Revised Statutes 14:42.1(C) provides: "For all purposes, 'forcible rape' and 'second degree rape' mean the offense defined by the provisions of this Section and any reference to the crime of forcible rape is the same as a reference to the crime of second degree rape."

24

assault. Accordingly, after viewing the evidence in the light most favorable to the State, we find that there was insufficient evidence to convict Mr. McDonough of second degree rape under subsection (A)(2). Thus, this assignment of error turns on whether a rational trier of fact could have found that the State proved beyond a reasonable doubt all the elements of second degree rape under subsection (A)(1).

In the matter *sub judice*, there is no dispute that Mr. McDonough and C.W. had sexual intercourse. The State and Mr. McDonough stipulated at trial that the DNA recovered from C.W.'s SAFE exam belonged to Mr. McDonough. Thus, there are only two issues in dispute: 1) whether C.W. consented to the sexual acts; and 2) whether C.W. was prevented from resisting Mr. McDonough by force or threats of physical violence under circumstances where C.W. reasonably believed that such resistance would not prevent the rape. Mr. McDonough contends that the intercourse with C.W. was consensual and further argues that he did nothing that would have made C.W. reasonably believe that resisting the sexual acts would be futile.

Review of the record demonstrates that there is sufficient evidence that C.W. did not consent to sexual intercourse with Mr. McDonough. C.W. testified at trial that before leaving One Eyed Jacks, she told Mr. McDonough multiple times that she did not want to have sex with him but finally relented to going to his condominium only after Mr. McDonough agreed that they would not have sex and that they would just eat some food and watch television. When C.W. and Mr. McDonough arrived at his condominium, C.W. initially acquiesced to kissing Mr. McDonough, but she tried to slow things down after Mr. McDonough began aggressively kissing her, touching her all over, and lifting her up onto the kitchen counter. C.W. walked away from Mr. McDonough to defuse the situation, but Mr.

McDonough followed her and continued to be aggressive while she was sitting on the couch waiting to eat. C.W. again walked away from Mr. McDonough and asked for a tour of his condominium to distract him. However, C.W. testified that when she went upstairs to the loft, Mr. McDonough followed her and blocked her path back downstairs. Mr. McDonough then began aggressively kissing C.W. again, removed her clothing, and threw her items of clothing over the balcony of the loft where C.W. would not be able to reach them. When Mr. McDonough tried to engage in oral sex with C.W., she told him "no." Finally, when C.W. realized that Mr. McDonough was going to penetrate her, she told him "no" again. C.W. testified that Mr. McDonough ignored her protestations and penetrated her, lifting her up and moving her around like an object. When they moved back downstairs, C.W. testified that Mr. McDonough again began penetrating her against her will and only stopped when she frantically questioned Mr. McDonough whether he had ejaculated inside of her.

C.W.'s testimony is credible in that she told Mr. McDonough from the beginning, before agreeing to go home with him, that she would not have sex with him. While at Mr. McDonough's condominium, C.W. continued to try and avoid sexual contact with Mr. McDonough despite his aggressive behavior. When Mr. McDonough tried to penetrate her, C.W. told him "no" and continued to tell Mr. McDonough "no" throughout the sexual assault. In sum, any rational trier of fact could have found that the State proved beyond a reasonable doubt that C.W. did not consent to sexual intercourse with Mr. McDonough. Further, any rational trier of fact could conclude that Mr. McDonough had knowledge that C.W. did not consent to sexual intercourse with him based on her statements at One Eyed Jacks, attempts at defusing Mr. McDonough's aggressive sexual advances, and C.W.'s

26

continual proclamations of "no" once Mr. McDonough began penetrating her. As this Court has previously held, "Credibility determinations are entitled to great weight and will not be disturbed unless contrary to the evidence." *State v. Rainey*, 2015-0892, p. 9 (La. App. 4 Cir. 1/27/16), 189 So.3d 439, 444 (citing *Scott*, 2012-1603, p. 11, 131 So.3d at 508). Further, and as stated above, it is not for this Court to assess the credibility of witnesses or reweigh the evidence. A review of the entire record shows that it was rational for the jury to find credible C.W.'s testimony that she repeatedly told Mr. McDonough "no," and that she was too afraid he would hurt her to fight him in an effort to prevent the sexual assault. It was also rational for the jury to accept C.W.'s testimony that when Mr. McDonough left the room, C.W. quickly made her escape.

Furthermore, the testimony of M.M., Mr. Allred, and Mr. McDonough's text messages following the assault corroborate C.W.'s testimony that she did not consent to sexual intercourse with Mr. McDonough. M.M. testified at trial that she met Mr. McDonough on Tinder in 2014 and went on one date with him. During the date, M.M. found Mr. McDonough to be aggressive and inappropriate. M.M. testified that she and Mr. McDonough went to One Eyed Jacks, where Mr. McDonough "constantly shoved" shots of alcohol in her face. M.M. stated that she did not remember all of the details of the night with Mr. McDonough but that she was drunk and told Mr. McDonough that she did not want to go to his condominium. M.M. testified that Mr. McDonough told her she was too drunk to be by herself and directed her towards his condominium. When M.M. woke up the next morning, she was naked and felt sore between her legs and immediately knew something had happened to her. M.M. testified that she called Mr. McDonough a rapist and left. M.M.'s experience on her first date with Mr. McDonough was very

similar to C.W.'s experience and further corroborates C.W.'s testimony that she was raped. The State offered M.M.'s testimony at trial because it demonstrated that Mr. McDonough had been accused of sexually assaulting another woman in an undeniably similar manner. *See State v. Tolliver*, 621 So.2d 17, 19 (La. App. 2d Cir. 1993) (explaining that "[g]enerally, evidence of other sex crimes committed by the accused against . . . a similarly situated victim falls into one of the [La. C.E. art.] 404[(]B[)[3]] exceptions" in particular when "the testimony shows that the factual circumstances of the prior acts and the crime charged are virtually identical, the evidence of the other crimes is corroborative of the victim's testimony and establishes a system or plan").

Mr. Allred, Mr. McDonough's friend of twenty years, asked Mr. McDonough if he raped C.W. after discussing the details of their first date. During that conversation, Mr. McDonough admitted to his friend that "[he] couldn't help getting into that p---y" and that he might have been aggressive with C.W. Mr. Allred further described an encounter Mr. McDonough had with his date "Rae," stating over text message that Mr. McDonough "almost raped Rae" during a taxi ride. Finally, Mr. McDonough texted C.W. the day after the assault and stated, "I'm sorry about last night. I was a little out of the box. I'm [sic] should have kept my hands to myself. You can't blame me. I'm sorry! Glad you made it home safe more than anything." Notably, Mr. McDonough's message, particular his use of the phrase "out of the box" is similar to how Mr. McDonough spoke to C.N. on the recording of their phone call after the incident with the other couple. Additionally,

---

[3] Louisiana Code of Evidence Article 404(B)(1)(a) states, in pertinent part: "Except as provided in [La. C.E. art.] 412 or as otherwise provided by law, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

Mr. McDonough's text message reflects that he knew his behavior was out of line and that he knew he had at a minimum touched C.W. inappropriately. The direct and circumstantial evidence provided by M.M. and Mr. Allred, in addition to Mr. McDonough's text messages to C.W. and Mr. Allred, corroborate C.W.'s testimony that she did not consent to sexual intercourse with Mr. McDonough.

Mr. McDonough also argues that the State failed to prove that he used force or threats, and he asserts that he did nothing during the sexual intercourse that would have caused C.W. to reasonably believe that resistance would be futile. In support of his argument, Mr. McDonough contends that there is no proof in the record that he threatened C.W. with physical violence; that C.W. was injured during the sexual assault; and that he did anything to cause her injury. In further support, Mr. McDonough argues that C.W. herself admitted that she had some bruising on her legs prior to her date with Mr. McDonough but that she did not know if he caused any of the bruising observed during her SAFE exam. However, Dr. Devlin's testimony reveals that he observed fresh bruising on C.W.'s legs during the SAFE exam. Nonetheless, C.W.'s testimony that she did not consent to sexual intercourse with Mr. McDonough and that she was too frightened to resist him is sufficient. "In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness'[] testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion." *McFarlin,* 54,754, p. 3, 354 So.3d at 891 (citing *State v. Gullette*, 43,032, p. 8 (La. App. 2 Cir. 2/13/08), 975 So.2d 753, 759 n.3). The testimony of a victim of sexual assault alone is sufficient even if the state does not offer medical, scientific, or physical evidence to prove that the defendant committed the offense. *Id.* at pp. 3-4, 354 So.3d at 891 (citing *State ex rel. P.R.R., Jr.*, 45,405, p. 6 (La. App. 2 Cir. 5/19/10), 36 So.3d 1138,

1141). Accordingly, C.W.'s testimony alone is sufficient to affirm Mr. McDonough's conviction.

Alternatively, Mr. McDonough argues that if it is determined that C.W. did not consent to the sexual intercourse, that his "conduct amounts to nothing more than a third degree (simple) rape." Third degree rape, as set forth in La. R.S. 14:43, is defined, in pertinent part, as follows:[4]

> A. Third degree rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
>
> . . . .
>
> (4) When the offender acts without the consent of the victim.

Mr. McDonough further contends that there was no evidence in the record that he threatened C.W. with physical violence and that he "did nothing which would have caused C.W. to reasonably believe that resistance would be futile." In support, Mr. McDonough relies on *State v. Clark,* wherein the defendant was charged with forcible rape, pled not guilty and, following a jury trial, was found guilty as charged. 2004-901, p. 1 (La. App. 3 Cir. 12/8/04), 889 So.2d 471, 472. The Third Circuit vacated the conviction and entered a judgment of guilty to the lesser included offense of simple rape. *Id.* at p. 7, 889 So.2d at 475.

However, we find *Clark* distinguishable. In *Clark,* the evidence presented demonstrated that the victim was intoxicated by consuming alcohol, smoking marijuana, and taking what she thought was a muscle relaxer, to the point where she could barely keep her eyes open. 2004-901, p. 4, 889 So.2d at 474. The victim

---

[4] Third degree rape is also referred to as "simple rape." *See* La. R.S. 14:43(C) (stating "For all purposes, 'simple rape' and 'third degree rape' mean the offense defined by the provisions of this Section and any reference to the crime of simple rape is the same as a reference to the crime of third degree rape").

in *Clark* testified that the defendant entered the room where she was sleeping, "took off his clothes, got in bed with her, and proceeded to have sex with her." *Id.* at p. 2, 889 So.2d at 473. Further, the victim testified that "she was 'frozen' and did not fight him off, scream . . . for help, or try to get away." *Id.* She did, however, plead for him to stop, but "was overpowered by him, a two hundred pound man." *Id.* The victim stated "that he pinned her down, but he did not threaten her and was not violent with her. She acknowledged she had no bruises or other physical injuries from the incident." *Id.* at p. 3, 889 So.2d at 473. Based on the evidence described above, the *Clark* court concluded that the defendant was guilty of simple rape, rather than forcible rape, reasoning:

> [T]here was simply no evidence presented that C.T. was prevented from resisting the act by force or threats of physical violence. There was, however, ample evidence that C.T. was prevented from resisting the act by her own alcohol and drug induced condition and that the Defendant was aware of that condition. In our view, the facts of this case illustrate the very purpose of the simple rape statute: to criminalize behavior which takes advantage of a person who has had too much to drink and participates in an act to which he or she would not otherwise have consented.

*Id.* at p. 6, 889 So.2d at 475.

The facts here are distinguishable from *Clark* because C.W.'s unrefuted testimony reflects she was not impaired at the time Mr. McDonough sexually assaulted her. Further, C.W.'s testimony at trial establishes that she was too frightened to resist Mr. McDonough, not that she was unable to resist him like the victim in *Clark*. Finally, C.W. testified that Mr. McDonough picked her up and moved her around "like a doll" during the sexual assault, unlike the defendant in *Clark* who got into bed with the victim and did not pick up or move the victim around.

Mr. McDonough also argues that it was not reasonable for C.W. to believe that resisting him would be futile. Mr. McDonough asserts that he stopped having sex with C.W. when she pushed him off and that she was free to leave because he did not lock his door. Thus, Mr. McDonough contends it was reasonable for him to believe that "C.W. was a willing sexual partner." However, Mr. McDonough's arguments do not account for C.W.'s testimony at trial regarding her subjective state of mind. To sustain a conviction for second degree rape, a victim is not required to exercise actual resistance; instead, a victim must only have a subjective, reasonable belief that resistance would have been futile. *State v. Thibeaux*, 2017-293, p. 27 (La. App. 3 Cir. 10/11/17), 229 So.3d 967, 984 (quoting *State v. Carter*, 2014-926, p. 12 (La. App. 3 Cir. 4/1/15), 160 So.3d 647, 654). This Court has affirmed forcible rape convictions despite arguments to the effect that there was insufficient evidence that the victims were prevented by force and/or threats from resisting the act of sexual intercourse. When affirming forcible rape convictions, this Court has repeatedly taken into consideration the subjective state of mind of the victims. *See State v. Wright,* 598 So.2d 561, 565 (La. App. 4th Cir. 1992) (though the defendant was not armed and did not threaten to hurt the thirteen-year-old victim, the victim was "too scared to fight defendant," having been advised, when she tried to push him away, to stop moving and that she was angering him); *State v. Brown,* 508 So.2d 118, 120 (La. App. 4th Cir. 1987) (affirming the forcible rape convictions when the nineteen-year-old victim testified "that she was scared and was forced to submit to the defendants" even though the defendants were unarmed).

Here, the record shows that it was reasonable for C.W. to believe that resisting Mr. McDonough would have been futile. Mr. McDonough ignored

C.W.'s statements that she would not have sex with him prior to going to his condominium. C.W. tried to slow down Mr. McDonough's aggressive physical acts by walking away from him, but he continued to kiss and touch her, and even lifted her onto the kitchen counter. Further, Mr. McDonough followed C.W. into the loft, blocked her path back down, and threw her clothing over the balcony. Moreover, when Mr. McDonough began penetrating C.W., he lifted her up and moved her around into different positions and only stopped when C.W. was finally able to push him off of her. When C.W. and Mr. McDonough returned downstairs, Mr. McDonough again penetrated C.W. against her will, lifting her up and moving her around, and he only stopped after C.W. asked if he had ejaculated. C.W. testified that she was frightened by Mr. McDonough and thought that she was risking her life by pushing him off of her and reminding Mr. McDonough that he had daughters. Given C.W.'s testimony, it was reasonable for C.W. to believe that resisting Mr. McDonough would be futile.

Accordingly, based on the subjective and reasonable fear C.W. experienced, which prevented her from resisting Mr. McDonough despite the absence of physical violence or threats, a rational fact finder could have found Mr. McDonough guilty beyond a reasonable doubt on the charge of second degree rape. Mr. McDonough's claim that there was insufficient evidence to support the jury's unanimous guilty verdict is without merit.

### Counseled Assignment of Error No. 2: the District Court's Denial of Mr. McDonough's Challenges for Cause

In his second counseled assignment of error, Mr. McDonough argues that his constitutional rights were violated when the district court erroneously denied his challenges for cause regarding three prospective jurors, namely Ms. Miller, Ms.

Vance, and Ms. Surtain,[5] thereby forcing Mr. McDonough to exhaust his peremptory challenges on these jurors. According to La. Const. art. I, § 17(A), a defendant is guaranteed the right to full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. Both the state and a defendant each have twelve peremptory challenges in trials of offenses punishable by imprisonment at hard labor. La. C.Cr.P. art. 799. When a defendant's challenge for cause is erroneously denied and he has exhausted all of his peremptory challenges, prejudice is presumed. *State v. Rumley*, 2014-1077, p. 24 (La. App. 4 Cir. 12/16/15), 183 So.3d 640, 658 (citing *State v. Carmouche,* 2001-0405, p. 8 (La. 5/14/02), 872 So.2d 1020, 1028). A district court's erroneous ruling on a defendant's challenge for cause, which results in the use of one of the defendant's peremptory challenges, constitutes a substantial violation of the defendant's constitutional and statutory rights and requires the reversal of the defendant's conviction and sentence. *Id.* at pp. 24-25, 183 So.3d at 658 (citing *State v. Juniors,* 2003-2425, pp. 7-8 (La. 6/29/05), 915 So.2d 291, 304). Thus, "to establish reversible error in the denial of one of his challenges for cause, a defendant needs to show: (1) that he exhausted all of his peremptory challenges; and (2) that the [district] court erred in refusing to grant his challenge for cause." *Id.* at p. 25, 183 So.3d at 658 (citing *Carmouche,* 2001-0405, p. 8, 872 So.2d at 1028).

Here, Mr. McDonough was entitled to a total of twelve peremptory challenges because his charged offense, second degree rape, required punishment at hard labor. La. R.S. 14:42.1. The record reflects that Mr. McDonough

---

[5] This Opinion will use only the last names of these prospective jurors to protect their privacy. *See State v. Turner*, 2019-0777, p. 7 (La. App. 4 Cir. 5/27/20), 301 So.3d 545, 550 n.4 (citing *State v. Hutsell*, 2017-0112, p. 31 (La. App. 4 Cir. 4/18/18), 241 So.3d 542, 560).

challenged Ms. Miller, Ms. Vance, and Ms. Surtain for cause on the basis that they agreed that a woman could decide she did not consent to a sexual act after it had already been completed. The record further shows that Mr. McDonough exercised three peremptory challenges to strike these jurors after the trial court denied his challenges for cause. In so doing, Mr. McDonough used his remaining peremptory challenges. Thus, Mr. McDonough has satisfied the first element because he exhausted all of his peremptory challenges. Accordingly, we must next address whether Mr. McDonough has shown that the district court abused its discretion in denying his challenges for cause as to Ms. Miller, Ms. Vance, and Ms. Surtain.

### Challenges for Cause

Louisiana Code of Criminal Procedure Article 797(2) authorizes a challenge for cause on the ground that "[t]he juror is not impartial, whatever the cause of his partiality." In *Groves,* this Court explained:

> [A] prospective juror's responses during voir dire cannot be considered in isolation and . . . a challenge for cause should be granted, even when a prospective juror declares his or her ability to remain impartial, if the juror's responses, as a whole, reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably inferred. *State v. Frost*, [19]97-1771, p. 4 (La. 12/1/98), 727 So.2d 417, 423; *State v. Hallal*, 557 So.2d 1388, 1389-1390 (La. 1990); *State v. Brown*, 496 So.2d 261, 264-265 (La. 1986); *State v. Jones*, 474 So.2d 919, 929 (La. 1985). Nevertheless, a refusal to disqualify a prospective juror on grounds he or she is biased will not constitute reversible error or an abuse of discretion if, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror demonstrates a willingness and ability to decide the case according to the law and the evidence. [*State v.*] *Jacobs*, [19]99-1659, [p.] 6 [(La. 6/29/01)], 789 So.2d [1280], 1285; [*State v.*] *Robertson*, [19]92-2660, [p.] 4 [(La. 1/14/94)], 630 So.2d [1278], 1281.

2020-0450, p. 37, 323 So.3d at 980 (alteration in original) (quoting *State v. Mickelson*, 2012-2539, p. 13 (La. 9/3/14), 149 So.3d 178, 187). Further, "the line-drawing required of district courts faced with challenges for cause of prospective

jurors who give equivocal or contradictory responses during voir dire is complicated and oftentimes daunting." *Id.* at p. 38, 323 So.3d at 980 (quoting *Mickelson,* 2012-2539, p. 12, 149 So.3d at 186). It is a "well-settled principle that an appellate court should accord great deference to the district court's ruling on a challenge for cause which is necessarily based, at least in part, upon the trial court's personal observations during questioning." *Id.* (citing *Mickelson*, 2012-2539, p. 12, 149 So.3d at 186-87). Accordingly, a district court's ruling on a challenge for cause will only be reversed when a review of the voir dire record as a whole reveals an abuse of discretion. *Id.* (citing *Mickelson*, 2012-2539, pp. 12-13, 149 So.3d at 187). With these principles in mind, we now turn to the voir dire examination of Ms. Miller, Ms. Vance, and Ms. Surtain.

*Ms. Miller*

Mr. McDonough argues that Ms. Miller should have been removed for cause because "[he did not] believe, based on her examination, that she [would] follow the law." Mr. McDonough further asserts that:

> Defense counsel … asked [Ms.] Miller … whether a woman could revoke or withdraw consent the next day or after the sex act and she answered that it was possible. She stated that a woman might have reasons for not saying anything during the sex act and then could decide the next day that she did not consent.

The voir dire transcript reflects that defense counsel informed Ms. Miller that "the question here is whether or not [the victim] consented to the sex act, when the sex act happened."  Ms. Miller agreed and opined, "If [the victim] didn't consent, then she did not consent." Ms. Miller explained that:

> [The victim] has the right to wake up tomorrow, and say that she did not want it. Everything is circumstantial . . . .  [I]f she did not say anything - - there could have been reasons . . . why she did not say anything.  But if she decided tomorrow to say, I did not consent to that, that's her right. So, she didn't consent.

The above colloquy reflects, and as the State asserted in its objection to Mr. McDonough's challenge for cause, that Ms. Miller "thought consent was the issue and there had to be consent during the act . . . ." Ms. Miller's focus on consent was not a misunderstanding of the law, but rather, an acknowledgment that a victim, assuming she did not consent during the act, is free to subsequently report the rape. *See, e.g., State v. Mims,* 50,143 (La. App. 2 Cir. 9/30/15), 181 So.3d 160 (upholding the rape conviction where the evidence supported that the victim did not consent to the rape and she reported the rape several days later).

The district court denied Mr. McDonough's challenge of Ms. Miller for cause, explaining that:

> She did indicate, during that questioning that there could be reasons why someone on the following day would say that they did not consent. But that does not rise to the level of an absolute. I also don't think that she stated any absolutes in terms of what would happen during the day, during the act versus what would happen the following day. She just noted that there could be reasons why someone would say that they didn't consent. And, she would look at -- I think she said, totally based [on], the circumstances. All right. So, that's denied.

The district court's ruling acknowledged that Ms. Miller believed that there may be circumstances where a woman would not object to a sexual act and still not consent to the act, such as instances where a woman was too scared to resist, like C.W. Thus, the trial court did not abuse its broad discretion in denying Mr. McDonough's challenge to Ms. Miller for cause.

*Ms. Vance*

Mr. McDonough next challenged Ms. Vance for cause based upon Ms. Vance "emphatically nodding her head in agreement with Mr. Said [another prospective juror] when he was stating that the accuser could revoke consent the next day and it would be rape." Mr. McDonough asserts that Mr. Said "stated it

could . . . still be rape if the woman regretted her actions the next day if she had perhaps been 'stand-offish' during the sexual encounter." To determine whether the district court abused its discretion in denying Mr. McDonough's challenge for cause regarding Ms. Vance, we must first review the statements made by Mr. Said.

A review of the voir dire transcript reflects that Mr. Said responded affirmatively to defense counsel's question whether a victim that did not verbally object to a sexual act, and instead gave non-verbal indications that she consented to the sexual act, could be rape. However, Mr. Said further explained his affirmative response, stating that the victim may have indicated that she did not consent by being "stand offish," while making hand motions, suggesting that the victim could "push[] off" her assailant, or move away from him. Defense counsel then asked whether, if there was no "pushing," "no outward demonstration that she wants to stop," "and her actions are indicating yes," would she still be able, the next morning, to claim she was raped. Once again, Mr. Said answered affirmatively and explained, "[I]t's not uncommon for people to go along with it, because they're afraid, or they don't know what to do." Accordingly, a review of the entire voir dire colloquy reflects that Mr. McDonough's characterization of Mr. Said's statements only provides a partial picture of Mr. Said's views, to which Ms. Vance agreed. The district court denied Mr. McDonough's challenge for cause regarding Ms. Vance, stating:

> All right. So what I have is, in the questioning of Mr. Said, he basically said something to the effect that if after the act, a person, the next day says, "what did you do?" And the person -- he went on and elaborated in that context. And, then said that's rape. He indicated if there's force, that's rape. And, so, I am going to deny the challenge for cause as to Ms. Vance.

The district court did not abuse its discretion in denying Mr. McDonough's challenge for cause. Mr. Said's characterization of what a rape victim experiences is similar to what C.W. experienced. C.W. explained that she tried to resist Mr. McDonough, scratching his back in an effort to stop him from raping her but "was too afraid to try harder." As discussed earlier, second degree rape is defined under La. R.S.14:42.1(A)(1) as a rape which occurs "under circumstances where the victim reasonably believes that such resistance would not prevent the rape." Ms. Vance demonstrated an understanding that a rape victim may be too scared to resist or fight back against her rapist. This recognition does not reflect a basis for finding that Ms. Vance could not follow applicable law, and the district court did not abuse its discretion in denying the challenge for cause.

*Ms. Surtain*

Finally, Mr. McDonough argues that the district court erred in denying his challenge for cause to Ms. Surtain because Ms. Surtain confirmed that she had indicated, upon initial questioning, that a person could revoke consent after the sexual act had been completed. After further questioning during the challenge conference, Ms. Surtain explained her reasoning:

> Yes. I answered -- yes. I did say that. Because number 1, you don't --
> I don't know if the person was drugged, drinking, and woke up and
> realized that she's in someone's bed. So, if the person who did was
> accused of raping her, was more sober, he should realize that, and let
> me back off from this lady.

Defense counsel asked Ms. Surtain to consider a situation where no drugs or alcohol were involved, and whether a victim could "decide the next day, well, [she] didn't like that, or for whatever reason." Further, defense counsel asked Ms. Surtain if a victim "can come up with whatever reason" she wants and say "in

hindsight" that she did not consent, such that it "makes that sexual encounter, sexual assault." Ms. Surtain responded, "Not really."

The district court disagreed with defense counsel's argument that Ms. Surtain could not follow the law and denied Mr. McDonough's challenge for cause. The district court did not abuse its broad discretion in this regard because Ms. Surtain responded negatively when asked whether a victim, in the absence of drug or alcohol impairment, could retroactively invalidate her apparent consent at the time of the sexual encounter.

Based on our review of the entire voir dire transcript, we find that Mr. McDonough has failed to show that the district court abused its discretion in denying his challenges for cause as to Ms. Miller, Ms. Vance, and Ms. Surtain. Accordingly, this assignment of error is without merit.

***Counseled Assignment of Error No. 3: Limitation of Cross Examination***

In his third counseled assignment of error, Mr. McDonough argues that the district court improperly limited his cross examination of C.W. and Detective Bruce regarding C.W.'s relationship with her ex-fiancé, G.T. Specifically, Mr. McDonough contends that the district court's refusal to allow him to cross-examine Detective Bruce and C.W. regarding C.W.'s breakup with G.T. shortly before the sexual assault at issue took place violated his constitutional rights under the confrontation clause.

Here, the record reflects that the district court allowed defense counsel to question both Detective Bruce and C.W. about a text message C.W. sent on the morning of September 15, 2016, prior to her date with Mr. McDonough, wherein C.W. told G.T. that "[her] thighs [we]re covered in bruises from [his] hands . . . ."

However, when defense counsel attempted to question Detective Bruce about C.W.'s relationship with G.T., the State objected based upon a lack of foundation and that the questioning was in violation of an earlier ruling by the district court. Thereafter, a discussion was held off the record, following which defense counsel moved for a mistrial, which the district court denied.

Mr. McDonough asserts that he wanted to question C.W. about her relationship with G.T. and their subsequent breakup so that he could present a defense "that C.W. fabricated the allegation of sexual assault in order to gain the attentions and affections of [G.T.]." Mr. McDonough contends that he was not trying to question C.W. about her sexual relationship with G.T., which would have violated La. C.E. art. 412, Louisiana's rape shield law statute,[6] but instead, wanted to question C.W. about her "interpersonal relationship" with G.T. and their breakup. However, Mr. McDonough asserts that the district court's refusal to allow this questioning denied him the opportunity to present a "plausibl[e] argument that C.W. was fabricating the rape allegation in order to get sympathy from [G.T.] . . . ."

The Louisiana Supreme Court addressed the issue of whether a defendant's constitutional rights were violated when he was not allowed to cross-examine a victim regarding her prior sexual relationship with another individual in *State v. Vaughn*, 448 So.2d 1260 (La. 1983). The *Vaughn* court explained that the right to confrontation in Louisiana expressly includes the right to cross-examine the prosecution's witnesses. 448 So. 2d at 1261 (citing La. Const. art. I, § 16). In light of a defendant's constitutional right to confrontation, the *Vaughn* court noted that

---

[6] Louisiana Code of Evidence Article 412 is titled "Victim's past sexual behavior in sexual assault cases; trafficking offenses."

the rape shield law in effect "cannot be mechanistically applied to deny admission of highly reliable and relevant evidence critical to an accused's defense." *Id.* at 1262 (citing *Davis v. Alaska,* 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)). Nonetheless, the court further explained that "where highly relevant evidence is available, the State's need to protect the victim from embarrassing cross-examination must be weighed against the probative value of the evidence to determine whether the right of confrontation is being infringed." *Id.* at 1267 (on reh'g). The court also reasoned that "where the evidence sought to be admitted is not relevant, the right to confrontation is not affected and there is no need to impose a balancing test." *Id.* In sum, the *Vaughn* court determined that evidence pertaining to a victim's past relationship must be relevant for the purpose of showing that the victim consented to the defendant's sexual advances.

In the matter *sub judice*, Mr. McDonough wanted to elicit evidence about C.W.'s relationship with G.T. to advance his "pity play" defense that C.W. fabricated the rape to gain sympathy from G.T. However, evidence about C.W.'s relationship with G.T. is not relevant to whether she consented to sexual intercourse with Mr. McDonough. Accordingly, the district court did not err in excluding this evidence. Further, Mr. McDonough had sufficient evidence to argue this defense even with the limited cross examination. C.W. testified that she texted G.T., along with numerous other friends and family members, that she had been raped. Mr. McDonough could, and did suggest at trial, that C.W. told G.T. about the rape in order to regain his affections.

Nevertheless, even if the district court did improperly limit the cross examination of C.W. and Detective Bruce, claims of confrontation clause

42

violations are subject to a harmless error analysis. *State v. Williams*, 2015-0866, p. 8 (La. App. 4 Cir. 1/20/16), 186 So.3d 242, 247 (citing *State v. Henderson,* 2013-0526, p. 12 (La. App. 4 Cir. 2/19/14), 136 So.3d 223, 230). This Court has previously explained, "Established case law provides that the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is unattributable to the error." *Id.* at p. 8, 186 So.3d at 248 (citing *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)). This is because "[a] trial error . . . may 'be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.'" *State v. Thomassie,* 2016-0370, p. 11 (La. App. 4 Cir. 12/21/16), 206 So.3d 311, 318 (quoting *State v. Merwin*, 2015-0681, p. 18 (La. App. 4 Cir. 1/27/16), 186 So.3d 759, 769).

As previously discussed when examining the sufficiency of the evidence, C.W. testified that she did not consent to sexual intercourse with Mr. McDonough, which was corroborated by the testimony of M.M. and Mr. Allred. Thus, Mr. McDonough's conviction was undoubtedly not attributable to his inability to present the "pity play" argument. Accordingly, this assignment of error lacks merit.

### Counseled Assignment of Error No. 4 and Pro Se *Assignment of Error No. 3: Excessive Sentence*

In his fourth counseled assignment of error, Mr. McDonough contends that his thirty-year sentence at hard labor without benefit of probation, parole, or suspension of sentence is excessive given this was a "run-of-the-mill" date rape case. This argument is restated and reargued in Mr. McDonough's third *pro se* assignment of error. This Court has previously held that "[b]oth the Eighth

Amendment of the United States Constitution[7] and the Louisiana Constitution, Article I, § 20,[8] prohibit the imposition of cruel and unusual punishment." *State v. Barbain*, 2015-0404, p. 28 (La. App. 4 Cir. 11/4/15), 179 So.3d 770, 787. The Louisiana Constitution also "explicitly prohibits 'excessive' punishment." *Id.* (citing La. Const. art. I, § 20.) In this regard, "[t]he Louisiana Constitution differs from the Eighth Amendment to the U.S. Constitution in its explicit prohibition of excessive sentences." *Id.* Thus, "[t]his 'deliberate inclusion by the redactors of the Constitution of a prohibition against "excessive" as well as cruel and unusual punishment broadened the duty of'" Louisiana appellate courts "'to review the sentencing aspects of criminal statutes.'" *Id.* (quoting *State v. Hamdalla*, 2012-1413, p. 14 (La. App. 4 Cir. 10/2/13), 126 So.3d 619, 626). This Court has also previously explained that "excessiveness of a sentence is a question of law," and we have held that "a reviewing court will not set aside a sentence [for excessiveness] absent a manifest abuse of discretion by the [district court]." *State v. Alridge,* 2017-0231, p. 39 (La. App. 4 Cir. 5/23/18), 249 So.3d 260, 288 (citing *State v. Wilson*, 2014-1267, p. 24 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165).

Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. *State v. Every*, 2009-0721, p. 7 (La. App. 4 Cir. 3/24/10), 35 So.3d 410, 417 (quoting *State v. Smith*, 2001-2574, p. 7 (La. 1/14/03), 839 So.2d 1, 4). We note, however, that

---

[7] The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

[8] Louisiana Constitution Article 1, Section 20 provides, in pertinent part, that "[n]o law shall subject any person to . . . cruel, excessive, or unusual punishment."

"the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society." *State v. Cassimere*, 2009-1075, p. 5 (La. App. 4 Cir. 3/17/10), 34 So. 3d 954, 958 (quoting *State v. Landry*, 2003-1671, p. 8 (La. App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239). This Court has explained that "[a] sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime." *State v. Ambeau*, 2008-1191, p. 9 (La. App. 4 Cir. 2/11/09), 6 So.3d 215, 221 (citing *State v. Bertrand*, 2004-1496, p. 6 (La. App. 4 Cir. 12/15/04), 891 So.2d 752, 757). Further, we have explained that "[a] sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice." *Id.* at p. 9, 6 So.3d at 222 (citing *State v. Baxley*, 1994-2982, p. 9 (La. 5/22/95), 656 So.2d 973, 979; *State v. Hills*, 1998-0507, p. 5 (La. App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217).

A trial court is afforded broad discretion in making sentencing decisions, and an appellate court will not set aside an imposed sentence if the record supports the sentence imposed. *State v. Bradley*, 2018-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100 (quoting *State v. Williams*, 2015-0866, pp. 12-13 (La. App. 4 Cir. 1/20/16), 186 So.3d 242, 250). Thus, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Mathieu*, 2018-964, p. 4 (La. App. 3 Cir. 11/6/19), 283 So.3d 1041, 1045 (quoting *State v. Barling*, 2000-1241, 00-1591, p. 12 (La. App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042).

Here, Mr. McDonough was sentenced to thirty years without benefit of probation, parole, or suspension of sentence for violating La. R.S. 14:42.1, which,

45

at the time of the sexual assault, provided that "[w]hoever commits the crime of second degree rape shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of probation, parole, or suspension of sentence." La. R.S. 14:42.1(B). When handing down the sentence, the district court stated:

> In this case, Mr. McDonough, you were convicted by a jury -- a unanimous jury verdict second degree rape. So based on the Court's review of the findings of the jury, the conviction and all of the circumstances surrounding that particular -- the conviction in this case as to [C.W.], the court now sentences you to 30 years to the Department of Public Safety and Correction without benefit of probation, parole, or suspension of sentence.

Mr. McDonough asserts that the district court "failed to take into consideration [his] lack of a criminal record or anything about his personal history" and "failed to individualize (or particularize) the sentence." In his *pro se* brief, Mr. McDonough also contends that the district court did not address the aggravating sentencing factors provided in La. C.Cr.P. art. 894.1.

"In determining the excessiveness of a sentence, the test employed by appellate courts is two-pronged." *Barbain*, 2015-0404, p. 29, 179 So.3d at 787. The reviewing court must determine: 1) whether the district court has adequately complied with statutory sentencing guidelines in La. C.Cr.P. art. 894.1; and 2) whether the sentence is warranted under the facts established by the record. *State v. Wiltz*, 2008-1441, p. 10 (La. App. 4 Cir. 12/16/09), 28 So.3d 554, 561 (quoting *State v. Batiste*, 2006-0875, p. 18 (La. App. 4 Cir. 12/20/06), 947 So.2d 810, 820). Nevertheless, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. *State v. Stukes*, 2008-1217, p. 25 (La. App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250 (quoting *State v. Major*, 1996-1214, p. 10 (La. App.

4 Cir. 3/4/98), 708 So.2d 813, 819). Further, La. C.Cr.P. art. 881.4(D) expressly states that an "appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed."

Our review of the record reveals that the district court did not fully comply with La. C.Cr.P. art. 894.1 because it did not articulate specific reasons for Mr. McDonough's sentence based on particular facts and considerations;[9] but our review of the record also shows an adequate factual basis for the sentence imposed by the district court. Mr. McDonough asserts—and the record reflects—that he had no prior criminal history. However, Mr. McDonough did have a history of sexual assaults based on the evidence presented at trial. Detective Bruce testified that L.K. told her that Mr. McDonough had sexually assaulted her on two occasions and presented medical records reflecting injuries she suffered during one of the assaults. Moreover, M.M. testified that she, like C.W., met Mr. McDonough through Tinder and went on a date with him. M.M. testified that she became intoxicated on the date because Mr. McDonough "shov[ed] shots in my face" and does not have a recollection of the rape, but that she woke up naked in Mr. McDonough's bed and "knew that something had happened" because she "was very sore between [her] legs."

As reflected in the second superseding indictment at the time of his sentencing, Mr. McDonough was charged with committing sexual assaults against M.M. and L.K. but had not yet been tried or convicted on those charges. Mr. McDonough contends that it is inappropriate to consider these charges in his sentencing because "[i]t is unclear whether the State can prove that [he] committed

---

[9] Louisiana Code of Criminal Procedure Article 894.1(C) states: "The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence."

any offenses against M.M. or L.K. . . . ." Nevertheless, Louisiana jurisprudence is clear that a district court, in sentencing a defendant, may consider other offenses, regardless of whether the defendant has been tried and convicted of the offenses, if there is a showing that the defendant perpetrated the other offenses. *See State v. Kirby,* 2022-0757, p. 11 (La. App. 4 Cir. 4/26/23), 360 So.3d 641, 649 (quoting *State v. Berry,* 630 So.2d 1330, 1334-36 (La. App. 4th Cir. 1993) (holding that a district court can "'consider . . . other offenses in sentencing the defendant[,]' whether said offenses resulted in convictions or acquittals" (alteration in original)). Accordingly, the district court properly considered the prior assaults against M.M. and L.K. when sentencing Mr. McDonough.

Additionally, the district court was permitted to take C.W.'s victim impact statement into account when sentencing Mr. McDonough. In her victim impact statement, C.W. explained that she suffered "horror and agony" in the years since the sexual assault, including suffering panic attacks, depression, and thoughts of suicide, and she feared that she could not go back to the practice of law because of her trauma. C.W. also stated that she has received continuous care from a psychiatrist and psychologist since the assault and was even hospitalized at a trauma rehabilitation center for 28 days. C.W. expressed that she did not want Mr. McDonough to be able to sexually assault anyone else and requested that she would "really . . . like to make sure he is in prison and on the sex offender registry for as long as possible . . . ."

A district court is well within its discretion to take a victim's request into account as a factor in imposing its sentence. In *State v. Collins,* the district court, following the defendant's conviction on the charge of forcible rape, considered,

*inter alia,* "the requests of the victim in this trial" before imposing a thirty-year sentence without benefit of probation, parole, or suspension of sentence, a sentence which the appellate court upheld. 2004-1441, p. 14 (La. App. 3 Cir. 3/2/05), 896 So.2d 1265, 1276.

Likewise, Mr. McDonough's lack of remorse is another factor that can be considered by the district court. *State v. Robinson*, 33,921, p. 5 (La. App. 2 Cir. 11/1/00), 770 So.2d 868, 872 (citing *State v. Shipp*, 30,562, p. 11 (La. App. 2 Cir. 4/8/98), 712 So.2d 230, 237; *State v. Daniels*, 607 So.2d 620, 625 (La. App. 2d Cir. 1992); *State v. Anderson*, 574 So.2d 468, 472 (La. App. 2d Cir. 1991); *State v. Colvin*, 452 So.2d 1214, 1224 (La. App. 2d Cir. 1984)). While Mr. McDonough did not testify at trial, he proclaimed his innocence at the sentencing hearing, took no responsibility for his crime, and did not apologize to C.W. for the pain and mental anguish he caused her. Instead, Mr. McDonough asserted that C.W. "lured" him upstairs, never said no, and went "berserk and start[ed] screaming at [him] after the fact." Mr. McDonough claimed that he, rather than C.W., was the victim and stated, "I've lost my life doing an act that was not unlawful."

Finally, in his *pro se* brief, Mr. McDonough cites *State v. Clark*, wherein the Third Circuit found that a fifteen-year sentence for first degree rape was excessive. 2005-647, p. 5 (La. App. 3 Cir. 12/30/05), 918 So.2d 552, 556. In his counseled brief, Mr. McDonough further contends that his thirty-year sentence in a "run-of-the-mill date rape case . . . is truly shocking to our sense of justice." In response, the State argues that while Mr. McDonough's sentence is harsh, "the testimony at trial demonstrated that [he] was not only C.W.'s assailant, but an active predator and danger to the women of New Orleans generally." The *Clark* court, after finding that the defendant was guilty of simple rape instead of forcible rape,

49

determined that "a sentence of five years or less is appropriate in this case." 2005-647, p. 5, 918 So.2d at 556. However, the defendant in *Clark* expressed responsibility for his actions and apologized to the victim, unlike Mr. McDonough, who maintained that he was actually the victim. *Id.* at p. 4, 918 So.2d at 556. Moreover, Mr. Clark did not have a prior history of sexually assaulting women, unlike Mr. McDonough.

Considering the district court's broad discretion and the facts and circumstances surrounding the matter *sub judice*, we find the sentence imposed on Mr. McDonough is neither grossly out of proportion to the seriousness of the crime nor one to shock the sense of justice. Accordingly, Mr. McDonough's sentence does not violate the prohibition against cruel and unusual punishment set forth in the United States and Louisiana Constitutions or the prohibition against excessive sentences set forth in the Louisiana Constitution. We therefore find this assignment of error lacks merit.

### Pro se Assignment of Error No. 1: Mr. McDonough's Right to Testify at Trial

In his first *pro se* assignment of error, Mr. McDonough asserts that he was denied the right to testify at trial by his counsel, which violated his constitutional rights. Mr. McDonough contends that he "desperately wanted to testify" but that "he was prevented from testifying on his own behalf" by his attorney. To support this argument, Mr. McDonough relies on a statement made by his attorney at the hearing on his motion for a new trial. Specifically, defense counsel explained at the hearing that while Mr. McDonough really wanted to testify, he advised Mr. McDonough not to do so because Mr. McDonough would have provided the State with "an opportunity to correct [an] evidentiary error." Defense counsel also

explained that the State did not call L.K., another victim of Mr. McDonough's sexual abuse, to the witness stand; but, as defense counsel further explained, if Mr. McDonough had testified, "it then [would have] open[ed] the State up to being able to call her in rebuttal." Mr. McDonough also cites to his statements during the sentencing hearing, wherein he explained that he really wanted to testify at trial but was advised by his attorney not to do so.

Louisiana Constitution Article I, Section 16 guarantees that a defendant has a constitutional right to testify in his own defense.[10] *See also State v. Dauzart*, 1999-3471, pp. 6-7 (La. 10/30/00), 769 So.2d 1206, 1210-11. The denial of the right to testify is not subject to a harmless error analysis if a criminal defendant is denied his right to testify at trial after unequivocally making known his desire to do so. *State v. Harrison*, 2022-0213, pp. 2-3 (La. App. 4 Cir. 5/11/22), 340 So.3d 159, 162-63 (citing *State v. Hampton*, 2000-0522, p. 10 (La. 3/22/02), 818 So.2d 720, 727), *writ denied*, 2022-00923, p. 1 (La. 9/20/22), 346 So.3d 279, 280. A court should presume a criminal defendant has knowingly and voluntarily waived his right to testify at trial when he does not take the stand to testify. *Id.* at p. 3, 340 So.3d at 163. This presumption can only be rebutted by a showing that an attorney caused the defendant to forego his right to testify. *Id.* (citing *Hampton*, 2000-0522, p. 14, 818 So.2d at 729). "To make that showing, a defendant must: (1) allege specific facts, and present an affidavit by his trial attorney, from which a court can reasonably find that the attorney informed the defendant 'that he was legally forbidden to testify or in some similar way compelled him to remain silent;' and (2) demonstrate that the record would support a finding that those specific factual

---

[10] Louisiana Constitution Article I, Section 16 states: "An accused is entitled . . . to testify in his own behalf."

allegations would be credible." *Id.* (citing *Hampton*, 2000-0522, p. 14, 818 So.2d at 729-30).

The record evidence indicates that Mr. McDonough has not made a showing that he was denied his right to testify because he failed to provide the Court with an affidavit from his trial counsel. Furthermore, based upon a review of the record, Mr. McDonough himself states that his counsel only advised him—and did not forbid him—from testifying at trial. Instead, defense counsel explained during the hearing on the motion for new trial that he advised his client not to testify so that the State could not correct an evidentiary error.

Finally, we note that Mr. McDonough's assertions that he was denied the right to testify at trial is predicated on an allegation of ineffective assistance of counsel. Louisiana jurisprudence has established that "[a]s a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted." *State v. Rumley*, 2014-1077, p. 32 (La. App. 4 Cir. 12/16/15), 183 So.3d 640, 662 (quoting *State v. Rubens*, 2010-1114, p. 58 (La. App. 4 Cir. 11/30/11), 83 So.3d 30, 66). Nonetheless, when there is a sufficient record, claims of ineffective assistance of counsel may be addressed on direct appeal. *Id.* We find that the record is sufficient to address Mr. McDonough's claim of ineffective assistance of counsel. For the same reasons discussed above, we find that Mr. McDonough did not make a showing that he was legally forbidden from testifying at trial. Mr. McDonough himself acknowledges that he was only advised not to testify, not forbidden. Accordingly, this assignment of error lacks merit.

***Pro se Assignment of Error No. 2: Testimony of M.M.***

In his second *pro se* assignment of error, Mr. McDonough contends that the district court violated his constitutional rights by permitting M.M. to testify to "newly remembered" evidence that had been excluded during a pretrial conference. In a March 11, 2022 pretrial hearing, the district court ruled that because subsequent statements by M.M. had not been provided to Mr. McDonough, no testimony regarding those statements would be admissible at trial. The court instructed that M.M.'s testimony should be confined to what was provided in her police report, specifically, that she could not remember the specific details of the alleged rape. Mr. McDonough contends that contrary to this ruling by the district court, M.M.'s testimony was not limited. Instead, M.M. "magically remember[ed] everything." Consequently, Mr. McDonough contends he is entitled to a new trial because the district court erred in allowing M.M. to offer testimony beyond the scope of the police report.

A review of M.M.'s testimony reflects that contrary to Mr. McDonough's claim, the district court sustained defense counsel's objection to M.M.'s testimony regarding the rape itself. M.M. testified that she recalled going to Mr. McDonough's apartment, being in his bedroom, Mr. McDonough taking her clothes off, saying "no," and Mr. McDonough being on top of her. Defense counsel promptly objected and moved for a mistrial. A discussion was held off the record, and when trial proceedings resumed, the district court sustained the objection, stating that "[o]bviously, the State and the defense understand the confines of the testimony that is allowed at this time." Defense counsel did not renew his motion for a mistrial, and the State proceeded with its direct examination of M.M. The prosecution did not ask any more questions concerning the alleged rape itself, but

rather, asked questions about what happened the following day when she woke up in his bed.

Based on the foregoing, the district court was well aware of the pretrial ruling limiting the scope of M.M.'s testimony and sustained Mr. McDonough's objection when the State attempted to elicit testimony beyond that ruling. Nonetheless, Mr. McDonough asserts that M.M.'s testimony was "was so damaging and full of inadmissible testimony [that] had it been removed from [his] trial he would not have been found . . . guilty." However, this Court has previously explained that "[t]he erroneous admission of evidence is subject to the harmless error analysis." *Thomassie,* 2016-0370, p. 11, 206 So.3d at 317 (citing *State v. Campbell*, 2015-0017, p. 27 (La. App. 4 Cir. 6/24/15), 171 So.3d 1176, 1192; *State v. Williams*, 2012-0252, p. 23 (La. App. 4 Cir. 4/17/13), 115 So.3d 600, 613; *State v. Hugle*, 2011-1121, p. 19 (La. App. 4 Cir. 11/7/12), 104 So.3d 598, 613; La. C.E. art. 103(A)). As discussed above, C.W. testified she told Mr. McDonough "no over and over again," but he did not stop penetrating her. Further, Mr. Allred's testimony and Mr. McDonough's text messages corroborated C.W.'s testimony that she did not consent to sexual intercourse with Mr. McDonough. M.M.'s brief reference to evidence the court had ruled inadmissible was harmless error and certainly had no effect on the jury's unanimous verdict. Mr. McDonough's argument in this regard lacks merit.

### Pro se Assignment of Error No. 4: Prosecutorial Misconduct

Finally, in his fourth *pro se* assignment of error, Mr. McDonough contends that his trial was fundamentally unfair because the State was in possession of recordings of his attorney-client phone calls that were made during his pretrial detention. Mr. McDonough argues that he is entitled to a new trial because the

State's access to his attorney-client phone calls gave the State "a blueprint to [Mr. McDonough's] case."

These recorded phone conversations were addressed in the March 11, 2022 pretrial hearing during which Mr. McDonough filed a motion to quash the indictment for prosecutorial misconduct. While the prosecutor admitted that an assistant district attorney, who was not involved in Mr. McDonough's trial, had access to Mr. McDonough's jailhouse calls, including attorney-client calls, she insisted that she did not listen to the attorney-client calls. The district court denied Mr. McDonough's motion to quash, noting that:

> Obviously we all agree about attorney/client privilege and what the scope of that is. It is extremely broad and it is very important to both the attorney and the client. If there is any indication, I don't expect that but if there is any indication that the State is utilizing anything that could have only been garnered through violation of the attorney/client privilege, whether it is the jail calls or any other way, then obviously the State will be in violation of multiple rules. Constitutional, State, and Judicial rules and obviously that would warrant an immediate mistrial.

Thus, if the State had actually listened to Mr. McDonough's attorney-client calls, then, as the district court noted, that would have violated "multiple rules" and Mr. McDonough would have been entitled to relief. However, that was not the case here because the prosecutor assured the district court that no assistant district attorney listened to Mr. McDonough's attorney-client phone calls and that the State did not utilize anything at trial that could have only been obtained through a violation of Mr. McDonough's attorney-client privilege. Accordingly, this assignment of error is without merit.

**DECREE**

For the foregoing reasons, we affirm Mr. McDonough's conviction and sentence for second degree rape.

**AFFIRMED**